# Board of Supervisors of King and Queen County
## v.
## King Land Corporation

Record No. 871056

June 9, 1989

Present: All the Justices

*L. B. Cann, III (James K. Cluverius; Teresa S. Hanger; Little, Parsley & Cluverius, P.C.*, on brief), for appellant.

*Robert E. Payne (Thomas E. Spahn; McGuire, Woods, Battle & Boothe*, on brief), for appellee.

Justice Russell delivered the opinion of the Court.

This appeal questions the correctness of the issuance, by the State Health Commissioner, of a permit to operate a solid waste landfill without requiring proof of financial responsibility pursuant to Code § 32.1-182. The Circuit Court of King and Queen County reversed a decision of the Department of Health. An appeal lay to the Court of Appeals pursuant to Code § 17-116.05(1), which governs appeals from decisions of administrative agencies. The decision of the Court of Appeals is usually final in such cases, Code § 17-116.07(A)(2), but we granted an appeal because the case involves a matter of significant precedential value. Code § 17-116.07(B).

On December 9, 1985, King Land Corporation applied to the Department of Health for a permit which would enable it to operate an industrial landfill in King and Queen County. King Land requested permission to dump 400 tons per day of industrial waste, consisting primarily of ash and asbestos, on a 120-acre site in that county. After investigating the site, the State Health Commissioner issued the requested permit on December 24, 1985. The permit imposed certain conditions on the disposal of waste, *e.g.*, incinerator ash was to be covered with six inches of soil and asbestos was to be covered with twelve inches of soil, but no conditions were imposed to assure the financial responsibility of the applicant.

In 1979, the General Assembly repealed former Title 32 of the Code and added new Title 32.1, captioned "Health." The new title included Chapter 6, captioned "Environmental Health Services." That chapter contained Article 3, captioned "Solid and Hazardous Waste Management" (Code §§ 32.1-177 through 32.1-186).[1] Code § 32.1-178(10) required the State Board of Health to "[p]romulgate such regulations as may be necessary to carry out its powers and duties and the intent of this article and the federal acts." Code § 32.1-180 provided: "On and after the effective date of regulations promulgated pursuant to this article, which date shall not be less than six months after promulgation, no person shall . . . [o]perate any sanitary landfill or other facility for the disposal of solid waste without a permit therefor from the Commissioner." Provision was made, in Code § 32.1-180(D), for continued operation of existing dumps under conditional permits, but such permits would all expire by June 30, 1983.

Code § 32.1-182, the subject of this controversy, provided in pertinent part as follows:

A. The Board shall, no sooner than October one, nineteen hundred eighty-one, promulgate regulations which insure that, in the event that a facility for the disposal of solid waste or a facility in which hazardous waste is stored, treated, or disposed is abandoned, the costs associated with protecting the public health and safety from the consequences of such abandonment may be recovered from the person abandoning the facility.

B. Such regulations may include bonding requirements, the creation of a trust fund to be maintained within the State Health Department, self-insurance, other forms of commercial insurance, or such other mechanism as the Board may deem appropriate. Regulations governing the amount thereof shall take into consideration the potential for contamination and injury by the solid or hazardous waste, the cost of disposal of the solid or hazardous waste and the cost of restoring the facility to a safe condition.

[1] In 1986, these sections were superseded by the Virginia Waste Management Act. Code § 10-268 et seq. In 1988, Title 10 was repealed and replaced by new Title 10.1, The Virginia Waste Management Act now appears as Code §§ 10.1-1400 et seq.

C. No sooner than October one, nineteen hundred eighty, and no later than March one, nineteen hundred eighty-one, the Board shall make available for public hearing and comment an initial draft of such regulations.[2]

The statute did not fix a date by which the Board's financial responsibility regulations must be promulgated or become effective. In December 1985, when the permit was issued to King Land in the present case, the Board had not yet promulgated any such regulations, even though five years had elapsed from the legislatively-mandated time when the proposed regulations were to be published for public hearing and comment. Because no such regulations were in effect in 1985, no proof of financial responsibility was required of King Land.[3]

The Board of Supervisors of King and Queen County (the "Supervisors"), after learning of the issuance of the permit to King Land, asked the State Board of Health to stay the effectiveness of the permit pending judicial review. The Board refused to do so, although its Director of Solid and Hazardous Waste Management stated that administrative steps had been taken to "prevent any occurrence of this type in any future permit action" by providing for a 30-day notice to the local governments affected and an opportunity for their comment before any future permits would be issued.

King Land began dumping industrial wastes at the site on January 6, 1986. On January 27, 1986, the supervisors filed a bill of complaint in the Circuit Court of King and Queen County, seeking a declaratory judgment, a permanent injunction, and damages. King Land, the State Health Commissioner, the State Board

---

[2] The substance of subsections A and B of this section is now contained in Code § 10.1-1410.

[3] The opinion of the Court of Appeals notes that "[t]he regulations were never promulgated because of the difficulty for facility operators to obtain proper financial assurances," according to an affidavit filed by a Health Department official. The same official also stated that 73 permits were issued between October 1, 1981 and December 31, 1985, without requiring proof of financial responsibility. *King Land Corp.* v. *Board of Supervisors*, 4 Va. App. 597, 603-04, 359 S.E.2d 823, 826 (1987). In oral argument at the bar of this Court, counsel stated that the Virginia Waste Management Board, created in 1986, has now promulgated financial responsibility regulations.

of Health, and others, were named as defendants. On June 23, 1986, the circuit court, Judge G. Duane Holloway presiding, entered summary judgment in favor of the supervisors. The court, noting that the regulations required by Code § 32.1-182 had still not been promulgated even though seven years had elapsed since the statute was enacted, held that the State Health Commissioner had committed an error of law, invalidated the permit, and remanded the case to the State Health Commissioner with direction that no new permit be issued in the case until proper regulations were promulgated and complied with.

King Land appealed to the Court of Appeals. That court, in *King Land Corp.* v. *Board of Supervisors*, 4 Va. App. 597, 359 S.E.2d 823 (1987), reversed the circuit court's award of summary judgment. The Court of Appeals held that the absence of an express deadline in Code § 32.1-182(A) showed a clear legislative intent not to fix any time limitation for the promulgation of financial responsibility regulations. *Id.* at 604, 359 S.E.2d at 826-27. Because the agency already had other regulations in effect, the Court of Appeals held that the permit had been validly issued pursuant to the only regulations which were statutorily mandated at the time. A dissenting judge concluded that the General Assembly intended that financial responsibility regulations be promulgated within a reasonable time after March 1, 1981, that five years was not a reasonable time, and that the agency's failure to comply with the statutory mandate rendered its permit action invalid.

 Perhaps the earliest judicial explication of the theory of statutory interpretation known as the "mischief rule," was given in Elizabethan England by the Barons of the Court of Exchequer:

> And it was resolved by them, that for the sure and true interpretation of all statutes in general (be they penal or beneficial, restrictive or enlarging of the common law,) four things are to be discerned and considered:
>
> 1st. What was the common law before the making of the Act.
>
> 2nd. What was the mischief and defect for which the common law did not provide.

> 3rd. What remedy the Parliament hath resolved and appointed to cure the disease of the commonwealth.
>
> And, 4th. The true reason of the remedy; and then the office of all the Judges is always to make such construction as shall suppress the mischief, and advance the remedy, and to suppress subtle inventions and evasions for continuance of the mischief, and *pro privato commodo*, and to add force and life to the cure and remedy, according to the true intent of the makers of the Act, *pro bono publico.*

*Heydon's Case*, 3 Co. Rep. 7a, 7b, 76 Eng. Rep. 637, 638 (1584). Four centuries later, the "mischief rule" retains its vitality. Our own cases have expressly adopted that approach. *N.&W.R.R. Co.* v. *Prindle and Wife*, 82 Va. 122, 130 (1886). Every statute is to be read so as to "promote the ability of the enactment to remedy the mischief at which it is directed." *Natrella* v. *Board of Zoning Appeals*, 231 Va. 451, 461, 345 S.E.2d 295, 301 (1986) (quoting *Jones* v. *Conwell*, 227 Va. 176, 181, 314 S.E.2d 61, 64 (1984)). The ultimate purpose of all rules of construction is to ascertain the intention of the legislature, which, absent constitutional infirmity, must always prevail. All rules are subservient to that intent. *Shackelford* v. *Shackelford*, 181 Va. 869, 877, 27 S.E.2d 354, 358 (1943). Further, it is a universal rule that statutes such as those under consideration here, which are remedial in nature, are to be "construed liberally, so as to *suppress the mischief* and advance the remedy," as the legislature intended. *Shumate's Case*, 56 Va. (15 Gratt.) 653, 661 (1860) (emphasis added).

█ We need not look far to discern the mischief the General Assembly sought to suppress by the enactment of Code § 32.1-182. The words of the statute itself evidence a legislative concern with "protecting the public health and safety from the consequences of . . . abandonment" of a "facility for the disposal of solid waste." Code § 32.1-182(A). The statute, by the use of the mandatory "shall," requires that the State Board of Health promulgate regulations to "*insure* that, in the event [such a facility] is abandoned, the costs associated with protecting the public . . .

may be recovered from the person abandoning the facility." *Id.* (emphasis added).

The statute was adopted during a period of heightened environmental awareness arising from a series of well-publicized calamities in Virginia and other states which had resulted from the uncontrolled disposal of industrial wastes. The cost of removing dangerous substances from the environment was extremely high, but in some cases there was no means of recovering that cost from those who created the danger. In those cases, the cleanup costs were necessarily borne by the taxpayers. Code § 32.1-182 was enacted to forestall that result by ensuring that persons about to embark upon the disposal of solid or hazardous wastes must first post bond or other security sufficient to defray any cleanup costs which might remain after the landfill was abandoned.

The statute obviously contemplated the danger that a landfill operator might pocket the profits from his operation and then abscond, leaving the cleanup costs to the public. The requirement of bonding or other guarantee of financial responsibility was the legislative means chosen to suppress that mischief. Any construction of the statute which would authorize the issuance of landfill permits without proof of financial responsibility subverts that legislative purpose.

Construing the statute so as to "suppress the mischief and advance the remedy," we conclude that the General Assembly intended that the State Board of Health develop financial responsibility regulations and make them available to the public for comment between October 1, 1980 and March 1, 1981, and that the period between March 1, 1981 and October 1, 1981 would serve as a grace period during which the proposed regulations might be amended pursuant to public input, and republished as amended. It was also a time during which applicants might seek and obtain appropriate financial backing before the regulations became effective. We further conclude that the General Assembly intended that after the expiration of that grace period, the previously published regulations were to be in effect, and that no permits were to be issued which did not comply with them.

We agree 'with the comment contained in the dissenting opinion in the Court of Appeals: "Where, as here, a public official is charged by statute to perform a duty, but the statute is silent as to the express time by which the duty must be performed, there is an implicit requirement that its mandate be fulfilled within a rea-

sonable time." *King Land Corp.*, 4 Va. App. at 607, 359 S.E.2d at 828. Thus, it was not necessary that the State Board of Health make its regulations effective on October 1, 1981, or on the next business day thereafter. But, in our view, after October 1, 1981, the State Health Commissioner lacked authority to issue any solid waste landfill permits until the mandated regulations were in effect and complied with by the applicants.

Having determined that the State Board of Health applied erroneous principles of law in its decision to issue the permit, we will reverse the order of the Court of Appeals and remand the case to that court with direction to reinstate the summary judgment entered by the circuit court and remand the case to the circuit court for such further proceedings as may be requisite, consistent with this opinion.

*Reversed and remanded.*

Justice Lacy, with whom Justice Compton joins, concurring in part and dissenting in part.

I concur with the majority's holding that, even though Code § 32.1-182 contains no specific compliance deadline, the State Board of Health was required to adopt regulations insuring that the safety and public health costs associated with abandoned landfills be borne by the person abandoning the landfill.[1] The majority's application of the "mischief rule," however, simply does not support the remedy imposed — invalidation of the landfill operation permit issued by the Commissioner of Health to King Land Corporation. Neither the language nor the history of the statutes supports a conclusion that the continuing authority of the Commissioner of Health to issue a permit to operate a landfill was contingent on adoption of the regulations in issue.

The majority states that "[a]ny construction of the statute which would authorize the issuance of landfill permits without proof of financial responsibility subverts [the] legislative purpose." The majority then finds that the General Assembly intended the § 32.1-182 regulations to be effective around October 1, 1981, and that after that date the Commissioner of Health lost his au-

---

[1] *See also King Land Corporation* v. *Board of Supervisors of King and Queen County*, 4 Va. App. 597, 605-08, 359 S.E.2d 823, 827-29 (1987) (J. Benton, dissenting).

thority to issue permits under § 32.1-180 until such regulations were adopted. Any other construction, according to the majority, would not "suppress the mischief and advance the remedy."

The majority, however, takes a very limited view of the "mischief" the General Assembly sought to remedy in 1979 when it enacted § 32.1-182 as part of Title 32.1. The stated purpose of the legislation reflects a comprehensive treatment of environmental and public health issues.[2] The "mischief" envisioned extended well beyond abandonment of landfills. Prior to the enactment of Title 32.1, regulation of solid waste disposal was wholly contained in two sections of the Code. *See* Code §§ 32-9.1 and 32-9.2 (Cum. Supp. 1978). No state-issued permits were required to operate landfills; rather, each county and city had to submit *its* plan for disposal of solid waste to the Department for approval. The legislature's purpose in 1979, when enacting Title 32.1 and specifically Chapter 6, Article 3, Solid and Hazardous Waste Management, was to put a comprehensive new regulatory scheme in place which would deal with the many varied elements of waste management, not just abandonment of landfills.

By terminating the Commissioner's licensing authority based on its limited definition of legislative purpose, the majority creates as much "mischief" as it seeks to remedy. Under its reasoning, valid permits could not be issued after October 1, 1981, thereby disrupting a multi-pronged regulatory scheme and withdrawing state control over an area clearly sought to be regulated by the 1979 legislation.[3]

The majority further justifies its "remedy" by finding a legislative purpose or intent to require that the financial responsibility

---

[2] Code § 32.1-2 states:

The General Assembly finds that the protection, improvement and preservation of the public health and of the environment are essential to the general welfare of the citizens of the Commonwealth. For this reason, the State Board of Health and the State Health Commissioner, assisted by the State Department of Health, shall administer and provide a comprehensive program of preventive, curative, restorative and environmental health services, educate the citizenry in health and environmental matters, develop and implement health resource plans, collect and preserve vital records and health statistics, assist in research, and abate hazards and nuisances to the health and to the environment, both emergency and otherwise, thereby improving the quality of life in the Commonwealth.

[3] The majority's holding apparently would also invalidate the 73 permits issued between October 1, 1981, and December 31, 1985, possibly subjecting those operators to civil penalties. Code § 32.1-186.

for abandoned landfills be tied to the application or initial grant of the landfill operation permit. No such connection can be found in the words of the applicable sections. To the contrary, the General Assembly gave the Board a wide range of alternative approaches:

> Such regulations may include bonding requirements, the creation of a trust fund to be maintained within the State Health Department, self-insurance, other forms of commercial insurance, or such other mechanism as the Board may deem appropriate.

Code § 32.1-182(B). This language does not mandate that an *application* for a landfill permit contain assurances of financial responsibility in the event of abandonment; nor does it *condition the granting* of the permit on such assurance. The creation of a trust fund, for example, presumably could require annual contributions of periodic assessments at times totally unrelated to the initial permit. As logical as it might be to have the requisite financial assurances incorporated in the initial licensing process, the General Assembly did not require this approach. The language of the statute not only belies the connection between the permit and the regulations, but reflects the legislative intent to give the Board complete discretion in *how* the regulations would insure the requisite financial responsibility. I cannot join in the majority's conclusion that the authority to issue landfill permits under § 32.1-180 was revoked for failure to adopt regulations under § 32.1-182 based on a finding of legislative intent so at odds with the sections themselves.

Recognizing the sweeping changes contained in new Title 32.1 and that adjustments in lead times would be required, the General Assembly provided a number of different but specific time frames and transitional provisions. The financial responsibility regulations were specifically barred from being effective until October 1, 1981, a full two years after the title itself became effective. Specific time frames also were set out for the promulgation of draft regulations in this area. Conditional permits which provided for transition of dumps into sanitary landfills were provided with a June 30, 1983, cut-off date. Code § 32.1-180. In light of the careful consideration and legislative expression of these specific dates, the failure of the General Assembly to include any reference whatsoever to removing the authority to issue permits because the

Board failed to adopt financial responsibility regulations further supports a legislative intent *not* to tie the two functions together.

The result reached by the majority, in my opinion, will be cited for the proposition that an agency's failure, or perceived failure, to comply with a legislative directive, puts its continuing operating authority in jeopardy. In my view, King Land complied with state regulations and obtained a valid permit from the State Health Commissioner to operate its landfill in King and Queen County.[4] Because the General Assembly did not condition the State Board of Health's authority to issue landfill permits on the promulgation of financial responsibility regulations, I would not invalidate King Land's permit.

---

[4] If the permit was not invalidated by the majority's action and King Land proceeded to operate its landfill, it would now be subject to the supervision and regulations of the Department of Waste Management. *See* Code § 10.1-1400 *et seq.*