R. A. BULALA, M.D., ET AL.

V.

HELEN C. BOYD, ET AL.

Record No. 890900

March 2, 1990

Present: Carrico, C.J., Compton, Stephenson, Russell, Whiting and Lacy, JJ.,
and Poff, Senior Justice

*Ronald D. Hodges (Phillip C. Stone; Wharton, Aldhizer & Weaver*, on brief), for appellant R. A. Bulala, M.D.
No brief or argument for appellant Commonwealth of Virginia

*William O. P. Snead, III; Andre M. Rybicki (J. Randolph Parker; Tucker & Parker*, on brief), for appellees.

JUSTICE RUSSELL delivered Parts I, II, III, IV, VII, and VIII of the opinion of the Court.

JUSTICE COMPTON delivered Parts V and VI of the opinion of the Court, in which CHIEF JUSTICE CARRICO and JUSTICES STEPHENSON, WHITING, and LACY join. JUSTICE RUSSELL, with whom SENIOR JUSTICE POFF joins, dissenting to Parts V and VI. JUSTICE WHITING dissenting to Part VI in part.

I

Pursuant to Rule 5:42, the United States Court of Appeals for the Fourth Circuit, on July 28, 1989, certified to this Court six questions of Virginia law, which we accepted by order entered September 25, 1989. The certified questions are stated as follows:

1. Where there are two or more plaintiffs entitled to recover damages arising from the same act or acts of medical malpractice, does § 8.01-581.15 apply individually to each plaintiff or overall to two or more such plaintiffs? If the statute does apply to all or any combination of plaintiffs' claims, how is it to be apportioned among them?

2. Does § 8.01-581.15 apply to damages for the infliction of emotional distress arising from some act or acts of medical malpractice?

3. Does § 8.01-581.15 apply to an award of punitive damages for an act or acts of medical malpractice?

4. Does Virginia law allow recovery for the loss of enjoyment of life when death results from an act or acts of medical malpractice?

5. Does Virginia law allow Veronica Boyd to recover damages for her lost earning capacity based upon the evidence presented in this case?

6. What is the effect, under Va. Code Ann. §§ 8.01-21, 8.01-25, and 8.01-56, of Veronica Boyd's death after verdict but before judgment in this case?

## II

## FACTS

The facts, which are substantially undisputed, are set forth in the opinion of the federal court, *Boyd* v. *Bulala*, 877 F.2d 1191 (4th Cir. 1989). A brief summary will be sufficient for our purposes. R.A. Bulala, M.D., an obstetrician and gynecologist, had a physician-patient relationship with Helen C. Boyd during Mrs. Boyd's pregnancy. Mrs. Boyd's child was expected in late February 1982, but on the morning of January 31 Mrs. Boyd was admitted to Clinch Valley Community Hospital in active labor. A nurse called Dr. Bulala at his home about 4:00 a.m. to notify him of Mrs. Boyd's admission, but Dr. Bulala chose to remain at home, about 20 minutes from the hospital, leaving Mrs. Boyd to be monitored by the nursing staff. Dr. Bulala had a standing order at the hospital that, in the absence of complications, he was not to be summoned until labor reached the "crowning" stage, meaning that stage at which the child's head comes into view. For that reason, the nurses did not call Dr. Bulala when Mrs. Boyd reached the second stage of labor, around 7:00 a.m.

About 7:45 a.m., the nurses discovered that the fetal heart rate had dropped far below normal, indicating an acute oxygen insufficiency. The danger to the unborn child had probably existed for an hour, but had not been discovered because of inadequate monitoring. About 8:00 a.m., a nurse called Dr. Bulala at home, and informed him of the complications. The nurses immediately took Mrs. Boyd to the delivery room, where she gave birth to a child, Veronica Lynn Boyd. As a result of the asphyxiation, Veronica suffered grave and permanent birth defects. Dr. Bulala arrived after the birth.

Veronica lived only from January 31, 1982 until March 10, 1985. She died after the verdicts were returned in the trial court, but before judgment was entered. Uncontroverted expert testimony established that Veronica was afflicted with cerebral palsy, would never be able to walk, would never mentally develop beyond the level of a one-year-old child, and, if she had survived, would have required institutional care all her life.

## III

## PROCEEDINGS

Helen C. Boyd, Roger E. Boyd, her husband, and Veronica, by her parents and next friends, brought this civil action against Dr. Bulala by complaint filed in the United States District Court for the Eastern District of Virginia, Alexandria Division. The case was transferred to the Western District of Virginia, Charlottesville Division. The mother's claim was based upon medical malpractice, alleging bodily injury including perineal tearing due to the defendant's failure to perform an episiotomy. In addition, Mrs. Boyd claimed damages for mental anguish arising from the birth of her profoundly impaired child. The father claimed damages arising from emotional distress. The child's claim was based upon her personal injuries. Veronica contended that she, as well as her mother, was Dr. Bulala's patient and that her claim also arose out of medical malpractice. The three plaintiffs did not claim separate awards of damages. Rather, their complaint concluded with an *ad damnum* clause demanding $6,800,000 compensatory damages and $800,000 punitive damages for the three plaintiffs jointly.

The case was tried by jury over a period of six days. On January 21, 1985, the jury returned the following separate verdicts against Dr. Bulala:

| | | | |
|---|---|---|---|
| (1) | For Veronica Boyd<br>Compensatory damages | - | $ 1,850,000 |
| (2) | For Veronica Boyd<br>Punitive damages | - | 1,000,000 |
| (3) | For Helen Boyd<br>Compensatory damages | - | 1,575,000 |
| (4) | For Helen Boyd<br>Punitive damages | - | 1,000,000 |
| (5) | For Roger Boyd<br>Compensatory damages | - | 1,175,000 |
| (6) | For Helen and Roger Boyd<br>(medical expenses until<br>Veronica reaches 18<br>years of age) | - | 1,700,000 |
| | Total verdicts | | $ 8,300,000 |

At the conclusion of the trial, Dr. Bulala moved the court, among other things, to reduce the verdicts to $750,000, the maximum amount recoverable under the medical malpractice cap contained in Code § 8.01-581.15. The plaintiffs argued that Code § 8.01-581.15 was unconstitutional. While the district court had this motion under consideration, Veronica Boyd died. Dr. Bulala moved for a new trial, asking that Veronica Boyd's action for personal injuries be converted into an action for wrongful death pursuant to Code §§ 8.01-25 and 8.01-56.

On November 5, 1986, the district court issued its opinion, *Boyd* v. *Bulala*, 647 F. Supp. 781 (W.D. Va. 1986), holding that the medical malpractice cap of § 8.01-581.15 infringed the right of jury trial guaranteed by the state and federal constitutions. The court overruled Dr. Bulala's motions and entered judgment in the full amounts awarded by the jury. The Commonwealth of Virginia and the United States, by leave of court, appeared as *amici curiae* and filed briefs requesting reconsideration of the court's ruling. On November 12, 1987, the district court issued its opinion denying the motions to reconsider, *Boyd* v. *Bulala*, 672 F. Supp. 915 (W.D. Va. 1987).

Five days later, Dr. Bulala moved the court to amend the judgment pursuant to Fed. R. Civ. P. 59(e), on the ground that the plaintiffs had, in 1982, brought a medical malpractice action in the Circuit Court of Tazewell County, Virginia, on the same facts, against Dr. Bulala and Humedicenter, Inc., had settled with Humedicenter for $650,000 and had nonsuited Dr. Bulala. The district court granted the motion, crediting the $650,000 against the four verdicts for compensatory damages in the same proportion each verdict bore to the sum of the four. *Boyd* v. *Bulala*, 678 F. Supp. 612 (W.D. Va. 1988). The court entered final judgment on the verdicts, as amended, by order entered February 2, 1988.

Dr. Bulala's appeal to the United States Court of Appeals for the Fourth Circuit raised, among others, the question of the constitutionality of the medical malpractice cap contained in Code § 8.01-581.15. During the pendency of the appeal, however, this Court, in *Etheridge* v. *Medical Center Hospitals*, 237 Va. 87, 376 S.E.2d 525 (1989), upheld the constitutionality of the Medical Malpractice Act. The United States Court of Appeals concurred with this Court's conclusion that the medical malpractice cap offends no provision of the Federal Constitution, followed this Court's determination in *Etheridge* that the cap offends no provi-

sion of the Virginia Constitution, decided certain issues, and certified to this Court the questions of law stated above. *Boyd* v. *Bulala*, 877 F.2d 1191 (4th Cir. 1989).

The United States Court of Appeals decided the following state-law questions: (1) A jury instruction on agency was proper. There was evidence to support the plaintiffs' contention that the nurses acted under Dr. Bulala's direction, rendering him vicariously liable for their negligence. (2) Roger Boyd, the father, was entitled to recover damages for emotional distress arising from the birth of his impaired child. Recognizing that Virginia law does not ordinarily permit such damages in the absence of physical injury, the Court of Appeals determined that the case fits within an exception to the physical-injury requirement created by our decision in *Naccash* v. *Burger*, 223 Va. 406, 290 S.E.2d 825 (1982).[1] (3) There was sufficient evidence of negligence on Dr. Bulala's part " 'so willful or wanton as to evince a conscious disregard' of plaintiffs' rights," to warrant submission of the issue of punitive damages to the jury. *Boyd* v. *Bulala*, 877 F.2d at 1198 (quoting *Booth* v. *Robertson*, 236 Va. 269, 272, 374 S.E.2d 1, 3 (1988)).

## IV

## THE MEDICAL MALPRACTICE CAP

The General Assembly enacted the Virginia Medical Malpractice Act (the Act) in 1976. Acts 1976, c. 611. The cap on recovery was contained in former Code § 8-654.8 (now § 8.01-581.15) in the following language:

In any verdict returned against a health care provider in an action for malpractice where the act or acts of malpractice occurred on or after April one, nineteen hundred seventy-seven which is tried by a jury or in any judgment entered against a health care provider in such an action which is tried without a jury, the total amount recoverable for any

[1] In *Myseros* v. *Sissler*, 239 Va. 8, 387 S.E.2d 463 (decided January 12, 1990), we reiterated the holding of *Hughes* v. *Moore*, 214 Va. 27, 197 S.E.2d 214 (1973), to the effect that damages are not recoverable for emotional distress in the absence of a physical injury. In *Myseros*, we observed that *Naccash* v. *Burger* is "confined to its particular facts." *Myseros*, 239 Va. at 9 n.2, 387 S.E.2d at 464 n.2. *Myseros* was, however, decided subsequent to the decision of the United States Court of Appeals in the present case.

injury to, or death of, a patient shall not exceed seven hundred fifty thousand dollars.

That provision applied at all times pertinent to this case.[2]

We recently restated the familiar principle that "[t]he ultimate purpose of all rules of [statutory] construction is to ascertain the intention of the legislature, which, absent constitutional infirmity, must always prevail. All rules are subservient to that intent." *Board of Sup.* v. *King Land Corp.*, 238 Va. 97, 103, 380 S.E.2d 895, 897 (1989) (citation omitted). We also restated our adherence to the ancient "mischief rule": "[e]very statute is to be read so as to 'promote the ability of the enactment to remedy the mischief at which it is directed.'" *Id.* (quoting *Natrella* v. *Board of Zoning Appeals*, 231 Va. 451, 461, 345 S.E.2d 295, 301 (1986) (citation omitted)).

It is not difficult to apply those principles to the present case because the General Assembly attached a preamble to the Act which sets forth an unusually explicit statement of the legislative purpose:

Whereas, the General Assembly has determined that it is becoming increasingly difficult for health care providers of the Commonwealth to obtain medical malpractice insurance with limits at affordable rates in excess of $750,000; and

Whereas, the difficulty, cost and potential unavailability of such insurance has caused health care providers to cease providing services or to retire prematurely and has become a substantial impairment to health care providers entering into practice in the Commonwealth and reduces or will tend to reduce the number of young people interested in or willing to enter health care careers; and

Whereas, these factors constitute a significant problem adversely affecting the public health, safety and welfare which necessitates the imposition of a limitation on the liability of health care providers in tort actions commonly referred to as medical malpractice cases. . . .

Acts 1976, c. 611. Thus, the legislative judgment was that the cap on recovery contained in the Act was the appropriate means of

---

[2] In 1983, the statute was amended to increase the cap to $1,000,000 for acts of malpractice occurring on or after October 1, 1983. Acts 1983, c. 496.

addressing the problem described in the preamble. *Etheridge*, 237 Va. at 94, 376 S.E.2d at 528.

█ For that reason, this Court decided, in *Etheridge*, that a single limit of $750,000 applied to an indivisible injury to a plaintiff, even though it was caused by the concurring negligence of two or more defendants. *Id.* at 105, 376 S.E.2d at 535. Any other construction would defeat the ability of the Act to "remedy the mischief at which it is directed."

█ The same reasoning governs this case. The pertinent statutory language is, "[i]n any verdict returned . . . in an action for malpractice . . . the total amount recoverable for any injury to, or death of, a patient shall not exceed seven hundred fifty thousand dollars." Code § 8.01-581.15 (1977 Repl. Vol.) Applying the foregoing principles to that language, we construe it to mean that in a medical malpractice action, the total damages recoverable for injury to a "patient" are limited to the statutory amount, regardless of the number of legal theories upon which the claims are based. It is as true in this case as it was in *Etheridge*, that a different construction would defeat the ability of the Act to "remedy the mischief at which it is directed."

## V

## THE PRESENT CLAIMS

The final judgment in the district court was based on the claims of the mother for compensatory and punitive damages; the claims of the child for compensatory and punitive damages; the claim of the father for compensatory damages; and the joint claim of the parents for medical expenses until the child reached 18 years of age.

We now relate our determination on the existence of a single cap to the present claims, focusing on the meaning of "patient," as defined by the Act. Code § 8.01-581.15 provides that the section shall be interpreted by applying the definitions found in Code § 8.01-581.1. The latter section, as pertinent, defines "Patient" as "any natural person who receives or should have received health care from a licensed health care provider." § 8.01-581.1(3) (1977 Repl. Vol.).

## A. Compensatory Damages

■ As we have stated, the mother had a physician-patient relationship with Dr. Bulala. Clearly, she was a "patient" within the meaning of the Act and entitled to the benefit of one statutory cap for her compensatory damage claim.

The elements of that claim encompass recovery for her own physical injury and the effect on her health according to its degree and probable duration. Her injury was the perineal tearing due to defendant's failure to perform an episiotomy. Among the other elements of the mother's claim associated with her physical injury are: recovery for physical pain, mental suffering, and medical expenses connected with her own physical injury. Additionally, the mother, as a part of her claim, would be entitled to recover for mental suffering resulting from the birth of a defective child. *See Modaber* v. *Kelley*, 232 Va. 60, 66, 348 S.E.2d 233, 236-37 (1986) (injury to fetus constitutes injury to mother allowing recovery for mental suffering associated with stillbirth).

■ We turn to the child's compensatory damage claim. In *Kalafut* v. *Gruver*, 239 Va. 278, 389 S.E.2d 681 (1990), decided today, we held that a "tortfeasor who causes harm to an unborn child is subject to liability to the child, or to the child's estate, for the harm to the child, if the child is born alive." *Id.* at 283-84, 389 S.E.2d at 684. We drew the line between nonliability and liability for prenatal injury at the moment of live birth of the child, when the child became a "person." Therefore, the child in this case had a claim against the defendant and would be entitled to the benefit of a separate statutory cap, provided she was defendant's "patient" within the meaning of the Act.

■ As we have noted, the Act defines "patient" as "any natural person who receives or should have received health care" from the health care provider. Accordingly, we hold that, at the moment of live birth, the child became the patient of the defendant obstetrician-gynecologist because she was a "natural person" who, at the instant of birth, received or "should have received" health care from defendant. Certainly, at the moment of live birth, the infant will not be deemed abandoned, under the care of no one. So it cannot logically be said that the child is not a "patient" and thus not covered by the Act.

■ This conclusion is compatible with the responsibilities, roles, and relationship in the birthing process between the obstetrician on the one hand and the pediatrician on the other. The practice of

obstetrics is defined as "a branch of medical science that deals with birth and with its antecedents and sequels." Webster's Third New International Dictionary 1559 (1981). The practice of pediatrics is defined as "a branch of medicine that deals with the child, its development, care, and diseases." *Id.* at 1664. Therefore, as we construe the Act, at the moment of live birth, and until the pediatrician assumes responsibility for the care of the newborn, the infant is the obstetrician's "patient." Hence, a separate statutory cap for compensatory damages applies to the child's case. And, the child's damage claim is comprised of the usual elements of damage, if established by the required proof, appropriate to any infant's personal injury action.

Turning to the claim, if any, the father may have for emotional distress and the parents' joint claim for medical expenses, we conclude that both of those claims fall within the child's statutory cap, under the circumstances of this case.

In *Speet* v. *Bacaj*, 237 Va. 290, 298, 377 S.E.2d 397, 401 (1989), we said that a parent's claim for emotional distress as the result of injury to the child is "wholly derivative" of the child's claim. Here, the father, of course, was not the defendant's "patient," within the meaning of the Act. Nevertheless, the emotional distress claim is covered by the Act because it is wholly derivative of the child's claim. However, the total damages recoverable for injury to the child, including derivative claims, are limited to the statutory amount. That amount has been exhausted by the child's claim in this case, leaving nothing to allocate to the father's claim.

In *Norfolk Southern Ry.* v. *Fincham*, 213 Va. 122, 128, 189 S.E.2d 380, 384 (1972), we said that a parent's "cause of action for medical and incidental expenses was a derivative action." Thus, the same rationale applies to the parents' claim for medical expenses that we applied to the father's claim for emotional distress. Because the expense claim is derivative, the total damages recoverable for the child's injury, including this derivative claim, is limited to the statutory amount, which has been exhausted.

## B. Punitive Damages

Under the facts and circumstances of this case, there can be no amount recovered for punitive damages. The plain meaning of the statute fixes the "total" amount recoverable at the statutory

cap. Application of the $750,000 cap serves, on the present facts, to extinguish the awards of punitive damages.

## VI

## APPORTIONMENT

The foregoing discussion provides answers to the first three certified questions, with the exception of the issue of apportionment. The mother's $750,000 cap limits her total recovery to that amount. Likewise, the child's $750,000 cap limits her total recovery to that amount. These amounts should be reduced equally by the district court's $650,000 credit in the amount of $325,000 each. Thus, the mother and the child each are entitled to a judgment in the principal amount of $425,000.

It follows from what we already have said that so much of the judgment which allows recovery for punitive damages, for the father's compensatory damage claim, and for the parents' joint medical expense claim, should be annulled.

## VII

## JURY INSTRUCTIONS

The district court charged the jury that, if it found for Veronica Boyd, it might consider any of the following elements of damages if caused by the defendant's negligence:

any bodily injuries she sustained and their effect on her health, according to the degree and probable duration of those bodily injuries; (2) any physical pain and mental anguish she suffered in the past, and any that she might reasonably be expected to suffer in the future; (3) any disfigurement or deformity, and any associated humiliation or embarrassment; (4) any inconvenience caused in the past and any that will probably be caused in the future; (5) *the loss of enjoyment of life*; (6) any medical expenses that she may be reasonably expected to incur in the future, after she reaches the age of eighteen; (7) *any loss of income and lessening of earning capacity, or either, that she may reasonably be expected to sustain in the future, after she reaches the age of eighteen years.*

(Emphasis added.) The defendant objected to the italicized portions of the charge and the fourth and fifth certified questions involve their propriety.

## A. Loss of Enjoyment of Life

We have not recognized "loss of enjoyment of life" as a separately compensable element of damages in personal injury cases. Whether the term applies to a plaintiff's cognitive anguish at the loss of pleasures he formerly enjoyed, or whether it applies to the non-cognitive plight of a plaintiff like Veronica, deprived of the ability to progress to the enjoyment of life's pleasures, the term is duplicative of other elements contained in the damage instruction. We agree with the views expressed by the Court of Appeals of New York in the recent case of *McDougald* v. *Garber*, 73 N.Y.2d 246, 536 N.E.2d 372 (1989). There, Chief Judge Wachtler observed that the term "suffering" can readily be understood by juries to encompass the mental anguish resulting from the loss of enjoyment of life. *Id.* at 256-57, 536 N.E.2d at 376-77. The opinion concludes:

Thus, we are not persuaded that any salutary purpose would be served by having the jury make separate awards for pain and suffering and loss of enjoyment of life. We are confident, furthermore, that the trial advocate's art is a sufficient guarantee that none of the plaintiff's losses will be ignored by the jury.

*Id.* at 257, 536 N.E.2d at 377.

## B. Loss of Earning Capacity

The jury instruction covering damages for "any loss of income and lessening of earning capacity, or either," was based upon evidence, admitted over the defendant's objection, by an economist who ascertained the median income for women in metropolitan areas in Virginia. He multiplied that income by the number of years in a normal work life expectancy, based on national averages, and discounted the product by factors based upon mortality, age, race, and sex.

The burden is upon a plaintiff to prove the elements of damages with "reasonable certainty." *Gwaltney* v. *Reed*, 196 Va. 505, 507, 84 S.E.2d 501, 502 (1954). Although "mathematical precision" is

not required, the plaintiff must "furnish evidence of sufficient facts or circumstances to permit at least an intelligent and probable estimate" of damages. *Id.* at 507-08, 84 S.E.2d at 502. Estimates of damages based entirely upon statistics and assumptions are too remote and speculative to meet that test. In order to form a reliable basis for a calculation of lost future income or loss of earning capacity, such evidence must be grounded upon facts specific to the individual whose loss is being calculated. *See Cassady* v. *Martin*, 220 Va. 1093, 1100, 266 S.E.2d 104, 108 (1980).

█ In a personal injury action, a plaintiff is not precluded from recovering damages for lost future earnings or for diminution of earning capacity by reason of his infancy. *See Moses* v. *Akers*, 203 Va. 130, 132, 122 S.E.2d 864, 865-66 (1961); *Watson* v. *Daniel*, 165 Va. 564, 573, 183 S.E. 183, 187 (1936). But we have never held that statistical averages alone can form a sufficient evidentiary foundation for such damages. In order to carry his burden of proof, an infant plaintiff, like any other plaintiff, must "furnish evidence of sufficient facts or circumstances" to enable the jury to make "an intelligent and probable estimate" of damages, *Gwaltney*, 196 Va. at 507-08, 84 S.E.2d at 502. Such evidence must relate to facts and circumstances personal to the plaintiff as an individual, not merely to his membership in a statistical class.

█ Undoubtedly, such an evidentiary standard may confront a plaintiff having no work history and no prospect of future earning ability with an impossible burden, but we think that result preferable to the unwarranted burden-shifting that occurs when future earnings are projected solely on the basis of statistics. Submission of the lost-earnings issue to the jury, in the circumstances of the present case, confronts the defendant with an unfair and improper burden of refutation. The evidence indulges, in the plaintiff's favor, the assumptions that if Veronica had been born a healthy, normal child, she would have lived a normal life span, would have been motivated to acquire a reasonable education, would have been motivated to acquire necessary work skills, would have been motivated to work all her life, and would have had the opportunity to do so without hindrance by health, economic, or other factors. The evidence assumes that Veronica would have been spared most of life's hazards. Because the burden is upon the plaintiff, those assumptions are impermissible. The defendant cannot refute them. Statistical averages are too remote from the plaintiff's personal

situation to "permit an intelligent and probable estimate" of her damages as required under *Gwaltney*.

We conclude that Virginia law does not permit recovery for "loss of enjoyment of life" as a separate element of damages, and that Virginia law does not permit Veronica Boyd to recover damages for her lost earning capacity based upon the evidence presented in this case.[3] These holdings provide answers to the fourth and fifth certified questions.

## VIII

### DEATH OF PLAINTIFF AFTER VERDICT

Code § 8.01-21 provides, in pertinent part, "[w]hen a party dies, . . . if such fact occurs after verdict, judgment may be entered as if it had not occurred." Code § 8.01-25 provides that a cause of action survives the plaintiff's death, but if the action was for personal injury, and the plaintiff dies as a result of that injury with a timely personal injury action pending, "the action shall be amended in accordance with the provisions of § 8.01-56." Code § 8.01-56 provides, in pertinent part:

> when a person who has brought an action for personal injury dies pending the action, such action may be revived in the name of his personal representative. If death resulted from the injury for which the action was originally brought, a motion for judgment and other pleadings shall be amended so as to conform to an action under [the wrongful death statute], and the case proceeded with as if the action had been brought under such section.

The defendant contends that §§ 8.01-25 and -56 mandate a conversion of Veronica Boyd's personal injury action into an action for wrongful death, necessitating a new trial, because her personal injury action was still "pending" at the time of her death. The United States District Court overruled the defendant's motion for a new trial, holding that the defendant's argument unnecessarily presupposes a conflict between § 8.01-21, on one hand, and §§ -25 and -56, on the other. *Boyd* v. *Bulala*, 647 F. Supp. 781, 795 (W.D. Va. 1986).

---

[3] Because of the application of the cap to the several awards of damages, the Federal Courts may decide to treat the district court's rulings on these issues as harmless error.

We agree with the district court's analysis. "The clear purpose of § 8.01-21 is to eliminate the wastefulness of retrying an action which has been completely litigated." *Id*. That section applies when, as in this case, a party's death does not occur until after verdict. Codifying a salutary common-law rule, Code § 8.01-21 gives the court the option, in that situation, of proceeding to final judgment as if death had not occurred.

 Code §§ 8.01-25 and -56 are not in conflict with § 8.01-21. They were enacted to extend the application of § 8.01-50, the wrongful death statute, to those situations not covered by the original Lord Campbell's Act, in which a plaintiff who has filed an action for personal injuries, dies of those injuries before a verdict is returned. It was unnecessary at common law to amend, revive, or convert the action if the party survived the return of a verdict, *Jackson* v. *Wickham*, 112 Va. 128, 132, 70 S.E. 539, 540 (1911), and it is equally unnecessary under the present statutory scheme. We conclude that Code § 8.01-21 authorizes the entry of final judgment in the circumstances of this case. This holding provides an answer to the sixth certified question.

Accordingly, the first and sixth certified questions are answered as hereinabove set forth, the second and third certified questions are answered in the affirmative, and the fourth and fifth certified questions are answered in the negative.

JUSTICE RUSSELL, with whom SENIOR JUSTICE POFF joins, dissenting in part.

I cannot agree with the reasoning contained in Parts V and VI of the Court's opinion. The majority impliedly recognizes that in order to become liable for personal injuries to another, a defendant must have caused injuries to a "person." Further, to come within the Medical Malpractice Act, a health care provider's negligence must have caused "injury to, or death of, a *patient*." Code § 8.01-581.15 (emphasis added). Therefore, in order to arrive at its conclusion, the majority must find that Veronica Boyd was both a "person" and a "patient" *before she was born*.

That is a particularly difficult feat on the facts of this case. The evidence demonstrated that all of Veronica's injuries resulted from Dr. Bulala's negligence during the time preceding the child's delivery. He is not charged with any acts or omissions which caused injury to the child either during the actual delivery, or thereafter.

Veronica was born "blue and limp," and suffering from severe asphyxiation as a result of oxygen deprivation before delivery.

In *Lawrence v. Craven Tire Co.*, 210 Va. 138, 140, 169 S.E.2d 440, 441 (1969), we said: "We are unwilling to hold that a child *en ventre sa mere* can maintain a common law action for personal injuries." We quoted with approval foreign authority which said: "We adhere to the rule that an unborn child *is a part of the mother until birth* and, as such, has no juridical existence." *Id.* at 142, 169 S.E.2d at 442 (emphasis added) (citation omitted).

In *Modaber v. Kelley*, 232 Va. 60, 348 S.E.2d 233 (1986), we were even more explicit. "In Virginia, the law is established that an unborn child is not a 'person' within the meaning of our wrongful death statute." *Id.* at 66, 348 S.E.2d at 236. "Furthermore, we have adopted the view in tort litigation that an unborn child *is a part of the mother until birth.*" (Emphasis added.) *Id.*, 348 S.E.2d at 236-37.

In light of the majority's opinion, it might be supposed that we had abandoned that view, were it not for *Kalafut v. Gruver*, 239 Va. 278, 389 S.E.2d 681 (decided today). There, we adopted the rule that a child born alive may maintain an action for injuries sustained *in utero*, but we carefully pointed out that "the rule we adopt today has no impact on the precedential value of *Lawrence* or *Modaber.*" *Id.* at 284, 389 S.E.2d at 684. Further, we reiterated our view that "a fetus is not a 'person.'" *Id.* at 281, 389 S.E.2d at 685.

Thus, if a child born alive has a cause of action for personal injuries sustained *in utero*, of what does its cause of action consist? In *Kalafut*, we were not required to answer that question, but we must do so here in order to determine the effect of the medical malpractice cap. Because, as the majority acknowledges in Part V(A), the child had no existence as a "person" when the injury occurred, the answer can only be that the child, after birth, has a cause of action for the injury sustained by the mother's body, of which it was a part, resulting from the defendant's negligence.

Further, the mother was the obstetrician's only "patient" at the time of his malpractice, because the Act defines a "patient" as a "natural person." Code § 8.01-581.1(3). At the time the tort was committed, Helen Boyd was the only "natural person" under the care and treatment of Dr. Bulala. It follows that although the child, after her birth, had a right to maintain an action in her own

name, *Kalafut*, 239 Va. at 286, 389 S.E.2d at 685, the child's cause of action was entirely derivative of her mother's claim.

The father's claim was equally derivative for the same reason. In the absence of Dr. Bulala's acts of malpractice committed against his patient, Helen Boyd, neither Veronica nor her father, Roger Boyd, would have had a cause of action.

The pertinent statutory language is "[i]n any verdict returned . . . in an action for malpractice . . . the total amount recoverable for any injury to, or death of, a patient shall not exceed seven hundred fifty thousand dollars." Code § 8.01-581.15 (1977 Repl. Vol.). All elements of damage claimed by Veronica, Roger, and Helen Boyd, individually and jointly, flow from a single "injury to . . . a patient," Dr. Bulala's neglect of Helen Boyd. *See* Code § 8.01-581.15; *Etheridge* v. *Medical Center Hospitals*, 237 Va. 87, 105, 376 S.E.2d 525, 535 (1989). Therefore, in my view, Code § 8.01-581.15 limits the "total recovery" to $750,000. Consequently, I disagree with the apportionment formula fashioned in Part VI of the majority's opinion.

JUSTICE WHITING, dissenting in part.

I dissent only from that portion of Part VI of the opinion which allocates the remainder of the compensatory damages attributable to the child's injuries, solely to the child's claim. Consistent with the approach of other jurisdictions, I would prorate these limited compensatory damages, derived from the child's injuries, among: (1) her individual claim; (2) her parents' derivative claim for medical expenses; and (3) her father's derivative claim for emotional distress. This allocation should be based on the claims' relative shares of the jury's original compensatory damage awards related to the child's injuries.

> Where several claims arising from one accident are joined in one suit against the insurer whose maximum liability under the policy is inadequate to pay in full the amounts to which the claimants become entitled, it has generally been held that the proceeds are to be distributed on a pro rata basis in accordance with the amount of damage suffered by each claimant.

15A G. Couch, *Insurance* § 56:35 (2d ed. 1983). This is true regardless of whether some of the claims are derivative in nature. *See, e.g., Wasserman* v. *Glens Falls Ins. Co.*, 19 A.D.2d 552, 552-53, 240 N.Y.S.2d 917, 918 (1963); *Landrum* v. *New Amsterdam Casualty Co.*, 149 So. 2d 182, 188 (La. Ct. App. 1963).

The jury's compensatory damage award related to the child's injuries, totalled $4,725,000,[1] of which $1,850,000 was allocable to the child individually. Therefore, the limited compensatory damages should be allocated among the several claims as follows:

| | Total | Child's Claim[2] | Father's Claim[3] | Parents' Claim[4] |
|---|---|---|---|---|
| Malpractice Cap | $750,000 | 293,651 | 186,508 | 269,841 |
| less: | | | | |
| Share of Previous Judgment | (325,000) | (127,249) | (80,820) | (116,931) |
| Allocable Remaining Compensatory Damages Related to the Child's Injury | $425,000 | 166,402 | 105,688 | 152,910 |

---

[1] Child's award............................................. $1,850,000
Father's award............................................. 1,175,000
Parents' award............................................. 1,700,000
Compensatory damages relating to child's injury $4,725,000

[2] The child's share of the respective total amounts is based on her share of the jury's total award of compensatory damages related to her injuries ($1,850,000/4,725,000).

[3] The father's share of these totals is based on his relative share of the jury award of compensatory damages relating to the child's injuries ($1,175,000/4,725,000).

[4] The parents' share of these totals is based on their relative share of the jury award of compensatory damages relating to the child's injuries ($1,700,000/4,725,000).