**Diane V. MURPHY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 2:92cv1309.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Oct. 6, 1993.

Malcolm Bernard Higgins, II, Virginia Beach, VA, Linda S. Laibstain, Hofheimer, Nusbaum, McPhaul & Samuels, Norfolk, VA, for plaintiff.

Anita K. Henry, Asst. U.S. Atty., Norfolk, VA, for defendant.

## ORDER AND OPINION

MORGAN, District Judge.

### I. STATEMENT OF FACTS AND DESCRIPTION OF PLAINTIFF'S INJURIES AND DAMAGES

On August 17, 1990, Diane V. Murphy was severely injured when the automobile she

was driving collided with a Navy vehicle. Because the United States has admitted liability for the aforementioned accident under the Federal Tort Claims Act (FTCA), the sole task of this Court is to determine the appropriate damage award to which the Plaintiff is entitled. Immediately after the collision, Mrs. Murphy was taken to Virginia Beach General Hospital (VBGH) and treated in the emergency room for a concussion, loss of consciousness, left-side jaw fracture, a fracture of the right knee, and numerous lacerations, hematomas, and muscular sprains and strains. She was thereafter admitted to the intensive care unit at VBGH.

Upon learning of his wife's accident, Lt. Terrence Murphy returned home from the Persian Gulf, where he was stationed aboard the USS Saratoga during Operation Desert Storm. Diane Murphy was released from VBGH roughly nine (9) days after the accident. When she arrived at her home, she was still encumbered with a device which wired her jaw shut and a cast on her right knee. In addition, she was charged with the care of her then four year old daughter, Kristen, who was in a full body cast, and her two young sons, ages 2 years and nine months respectively. Lt. Murphy was compelled to return to the Saratoga on September 4, 1990.

During the next several weeks, as Diane Murphy attempted to care for the couple's three young children, the true severity of her cognitive deficits began to emerge. She had total amnesia with respect to the accident itself, little short-term memory, a short attention span, was highly emotional, and became fatigued by even the simplest household chores. Mrs. Murphy even had no rec-

ollection of the birth of her youngest child, T.J.

The Plaintiff's condition forced Lt. Murphy to return home from the Saratoga on emergency leave again on October 5, 1990. At this point, Lt. Murphy became increasingly concerned over his wife's prognosis, since many of the deficits which the doctors thought would improve over time had either continued or worsened. As a result, she was evaluated by Head Trauma Rehabilitation of Hampton Roads (HTR) in November of 1990. Based upon a neurological evaluation performed by Dr. John Lavach, the Plaintiff was advised to undergo rehabilitation therapy five (5) days per week.[1] Due to the length of the drive from the Murphys' home in Virginia Beach to the rehabilitation facility in Newport News, coupled with the Plaintiff's inability to drive, she was only able to attend HTR three (3) days per week.

Diane Murphy continued her rehabilitation at HTR through March of 1992. During this period, she made modest improvement; she learned various "compensatory strategies" which served as a substitute for her lack of memory. Her organizational skills and ability to plan also showed progress. However, the Plaintiff's memory loss limited her treatment. Due to her almost complete short term memory loss, her doctors and therapists were forced to rely upon second-hand information from Lt. Murphy when attempting to diagnose and treat her. Moreover, her attention deficit, chronic fatigue, and pain still prevented her from performing most of the household tasks and childrearing duties. Although Mrs. Murphy routinely sleeps for 10 or 11 hours per day, she is

---

1. Testing reveals that Diane Murphy has suffered a substantial lowering of her IQ and, in addition to memory deficits and chronic fatigue, suffers from a lack of concentration, behavioral disorders, taste and smell irregularities, and chronic headaches. What has been described as her "cognitive functions" has been severely and irregularly impacted. Several health care providers have tested her cognitive abilities and found that she has abilities ranging from average to high average in her vocabulary and analytical areas, but falls in the low average to mentally retarded range with respect to memory, reading and math comprehension, and ability to learn new functions.

For reasons which may be based upon the therapy which she has already received, but are otherwise unexplained, the Plaintiff appears able to carry on a simple conversation in a normal fashion. Her speech does not appear to be impaired in any degree. However, when the Plaintiff was asked what change to expect if she presented a $10 bill in payment of $6.50 worth of food, she could not respond. Similarly, when questioned regarding a statement she had made approximately 10 minutes earlier, Mrs. Murphy had no recollection of having made the statement.

constantly fatigued during the day and must take periodic naps in order to make it through her waking hours.

In addition to rehabilitation for her cognitive deficits, the Plaintiff has also undergone numerous follow-up treatments for her physical injuries. She continues to experience pain of varying degrees in her right knee, neck, back, and the Temporal Mandibular Joint of her jaw (TMJ). Her physicians have not been able to estimate whether these conditions will be permanent, but the conditions have persisted for a period in excess of three (3) years after the accident. In addition, the Plaintiff suffered some scarring to her face which may be improved, albeit not eliminated, by plastic surgery.

The Plaintiff also required substantial dental work due to the accident, and her inability to keep her mouth open for long periods of time due to intense TMJ pain prolonged the length of her treatment sessions. Moreover, her allergic reaction to the normal anaesthetic forced the dentist, Dr. Wernick, to make many additional injections. She has been required to take pain medication and permanently adjust her diet and speech due to difficulties arising from the continued use of her jaw. She is still undergoing dental treatment, and the problems caused to her permanent teeth by the accident will continue to a substantial degree throughout her lifetime.

In the months shortly after the accident, the Plaintiff refused to accept the fact that she was disabled in any way and told various health care providers that she would be all right as soon as she could drive. Diane Murphy's primary motivation while at HTR was to obtain a new driver's license so that she might regain some of her independence. In September of 1992, however, she failed the Sentara Norfolk General Hospital driving evaluation test. As a result of this failure, she became extremely depressed and withdrew from therapy for several months. In January of 1992, the Plaintiff returned to HTR. She passed her second driving test and received a restricted license. After sev-

eral trips with Lt. Murphy, however, it became obvious that Mrs. Murphy was not capable of making the split-second decisions required of all drivers; she became easily disoriented and confused. In addition, the onset of her myoclonus or seizure-like disorder (discussed below) will effectively prevent her from ever resuming driving, since her physicians are of the unanimous opinion that these events are permanent and will never be completely controlled through medication.

In late 1990, roughly four (4) to six (6) months after the accident, Mrs. Murphy began experiencing seizure-like episodes.[2] These episodes usually lasted only one to two seconds and involved a jerking of the left arm and the head, rather than the convulsions and complete loss of consciousness traditionally associated with complex seizures. Dr. Robert I. Solomon, the Director of HTR, diagnosed these episodes as "myoclonic jerks" in December of 1990 and prescribed a low dose of the anti-convulsant Depakote to help control these spasms, which initially occurred as many as twenty (20) times per day. Dr. Solomon also noted that the Plaintiff often experienced confusion and strange smells and tastes in association with these episodes.

By March of 1992, the Murphys had exhausted their financial resources, and Diane Murphy was forced to stop her rehabilitation at HTR. Sharon Powell Reavis, the life-care planner with whom the Murphys had been working, subsequently referred her to Dr. Nathan Zasler, a Richmond physiatrist. Dr. Zasler first examined Mrs. Murphy on July 8, 1992, and immediately diagnosed her seizure-like disorder as post-traumatic epilepsy. He also opined that the Depakote prescribed by Dr. Solomon was not achieving optimal results, and Dr. Zasler changed the Plaintiff's medication to Tegretol, which he stated has limited the number of seizure episodes to several per month.

As a result of his wife's cognitive deficits, Lt. Murphy has been forced to assume most of the homemaking functions, while perform-

**2.** While there continues to be some dispute as to whether the physical phenomenon suffered by the Plaintiff should be properly classified as myoclonus or partial epileptic seizures, there is no dispute that the condition evolves from an organic brain injury, is permanent, and will require continuous medication for the remainder of Diane Murphy's life.

ing his full-time job as a pilot on active duty in the naval reserve. He often returns home during the afternoon to check on his wife and children. Lt. Murphy has had to resign his regular Navy commission and accept reserve status so that he would not have to leave his family for long periods of time when deployed overseas. Although there is overwhelming evidence that Lt. Murphy has made tremendous efforts to accommodate his wife's problems, several health care providers testified that their marriage is at risk. The true extent of this risk is readily apparent from the testimony of the Murphys themselves: the Plaintiff described herself as a child within an adult body, and Lt. Murphy even said that she was often more like a fourth child than his wife.

Diane Murphy's brain injury has also adversely affected her relationships with her children and friends. The Murphys have been forced to hire a series of housekeepers to help care for the children since the accident. When Susan Kaplan was employed in the home the Plaintiff's youngest child, T.J., referred to Mrs. Kaplan, in the Plaintiff's presence, as "Mama". Moreover, when one of the children gives Mrs. Murphy a hug she often stiffens in pain. Her need for sleep during the day prevents her from properly supervising the children, and on occasion her husband has found her asleep with his young children in or out of the home unattended. The Plaintiff sleeps so soundly at night that almost no outcry from a child will awaken her. Lt. Murphy and a number of health care providers, as well as friends, have indicated that they are concerned about Mrs. Murphy's and the children's safety while she is alone with them.

The Plaintiff's impaired memory, combined with her own reduced self esteem, has caused her to withdraw from participation in community and social activities. She was formerly characterized as gregarious and outgo-

ing, with a good sense of humor. Mrs. Murphy also participated in a number of activities, including the Navy Wives Association, regular physical workouts at a health spa, playing the banjo, and activities associated with her children. Her loss of memory, however, coupled with her inability to drive, has effectively prevented Diane Murphy from engaging in any of these activities. She has difficulty with her friends, because the common experiences which they shared together in the past have ceased to exist for Diane Murphy. As she testified at trial, after a while, it becomes both embarrassing and mentally exhausting to see the same people over and over again and still feel as if you are meeting them for the first time.

## II. CALCULATION OF PLAINTIFF'S DAMAGES

### A. Plaintiff's Motion to Amend Ad Damnum Under the Federal Tort Claims Act

A suit against the United States under the Federal Tort Claims Act is limited to the amount of damages originally requested by the plaintiff in the administrative claim, unless the plaintiff is able to show that newly discovered evidence or intervening facts have come to light which were not available at the time the administrative complaint was filed. 28 U.S.C. § 2675(b).[3] It is well established that the burden of proving newly discovered evidence or intervening facts rests with the FTCA claimant. *See Kielwien v. United States*, 540 F.2d 676, 680 (4th Cir.1976), *cert. denied*, 429 U.S. 979, 97 S.Ct. 491, 50 L.Ed.2d 588; *see also Allgeier v. United States*, 909 F.2d 869, 877 (6th Cir.1990).

While there is a split among the Circuits over precisely what constitutes "newly discovered evidence" or "intervening facts,"[4]

---

**3.** "§ 2675. Disposition by federal agency as prerequisite; evidence

(b) Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal

agency, or upon allegation and proof of intervening facts, relating to the amount of the claim."

**4.** *See Michels v. United States*, 815 F.Supp. 1244, 1260–1263 (S.D.Iowa 1993) (excellent summary of split among the Circuits); *compare Cole v. United States*, 861 F.2d 1261, 1262 (11th Cir. 1988) ("reasonably based change in expectation as to the severity and permanence of an injury is

the United States Court of Appeals for the Fourth Circuit has adopted the approach more favorable to the injured party. *See, e.g., Spivey v. United States,* 912 F.2d 80 (4th Cir.1990). In *Spivey,* a motorist brought an action under the FTCA, seeking to recover for psychological injuries sustained in an automobile accident with a Navy recruiter. After filing his administrative complaint, the claimant subsequently developed tardive dyskinesia as a result of the medication he was taking. The Fourth Circuit permitted the claimant to increase his *ad damnum,* concluding that the development of the claimant's condition represented "newly discovered evidence" within the meaning of § 2675(b), despite the fact that tardive dyskinesia was a known possible side effect of the medication. *Id.* at 85.

In the instant case, the Magistrate Judge granted the Plaintiff's Motion to increase the *ad damnum* to $6.5 million on August 12, 1993, finding that the Plaintiff had met her burden of proof by showing that (1) the permanence of her post-traumatic "seizure-like" disorder, (2) her ischemic brain injury, and (3) the functional diagnosis that led to the Plaintiff's present inability to operate a motor vehicle, were not readily discoverable prior to the time the administrative complaint was filed. As the Government points out, the plain language of 28 U.S.C. § 2675(b) mandates that any increase over and above the $3.0 million requested in the Plaintiff's administrative claim must be based upon one of the three aforementioned grounds.[5]

■ This Court FINDS that the Plaintiff's damage award is not limited to $3.0 million, because the Plaintiff and her health care providers were unaware of the true nature and extent of her cognitive deficits, seizure-like disorder, and functional disabilities at the time the administrative claim was filed.

The record indicates that the Plaintiff filed her administrative complaint on June 29, 1992. At that time, her seizure-like episodes had been diagnosed by Dr. Solomon as "myoclonic jerks," a condition which virtually every individual experiences at various times throughout his or her life. Dr. Solomon did not definitively diagnose Diane Murphy's myoclonus as a permanent condition at that time. It was not until July 8, 1992, approximately nine (9) days after the complaint was filed, that Diane Murphy first saw Dr. Zasler and was diagnosed as suffering from a permanent seizure-like disorder, which he classified as post-traumatic epilepsy. While the evidence presented at trial has failed to establish whether the Plaintiff's disorder should be classified as myoclonus or partial seizure disorder (a form of post-traumatic epilepsy), this Court believes that only after Dr. Zasler's diagnosis did the true severity, consequences, and permanence of Mrs. Murphy's seizure-like episodes become apparent, both to her doctors and to herself.

Moreover, diagnosing these episodes as permanent has had a substantial impact upon the plaintiff's goal of ultimately regaining her driving ability. Once Mrs. Murphy was diagnosed as having a permanent seizure-like disorder, she became subject to an unwritten medical policy of the Virginia Department of Motor Vehicles, under which an individual must be seizure-free for at least six (6) months in order to be certified to operate a motor vehicle. Every expert witness who testified at the trial concluded that Diane Murphy would almost certainly continue to experience seizure-like episodes for the rest of her life, despite her continuous use of anticonvulsant medication.

This Court FINDS that the Plaintiff should not reasonably have been expected to know the severity and permanence of her seizure-like disorder prior to the filing of her administrative complaint on June 29, 1992,

---

newly discovered evidence within the meaning of § 2675(b)") *and Allgeier v. United States,* 909 F.2d 869, 879 (6th Cir.1990) (upholding district court's decision to allow amendment of *ad damnum* where the plaintiff's need for a second knee operation and additional treatment were not foreseeable at the time the administrative claim was filed due to post-filing deterioration of the plaintiff's medical condition) *with Reilly v. Unit-*

*ed States,* 863 F.2d 149, 171 (1st Cir.1988) ("[d]iagnoses which are no more than cumulative and confirmatory of earlier diagnoses are neither 'newly discovered evidence' or 'intervening facts' for the purpose of § 2675(b)").

5. Defendant's Pretrial Memorandum on Damages at 3–4.

and HOLDS that insofar as its award exceeds $3.0 million, such amount is directly related to "newly discovered evidence" within the meaning of 28 U.S.C. § 2675(b).

## B. Special Damages

The Court has computed the Plaintiff's total special damages, which include expenses already incurred and anticipated future expenses adjusted for inflation and present value. The Defendant offered no objection to the expenses already incurred by the Plaintiff and objects to only one of the Plaintiff's future expenses as projected in the Life Care Plan (Plaintiff's exhibit 25).[6]

At trial, the Plaintiff presented evidence regarding the following elements of special damages, without objection by the Defendant:

SPECIAL DAMAGES
PREVIOUSLY IN-
CURRED:
(1) MEDICAL AND
DENTAL EX-
PENSES,
(2) CHILD CARE EX-
PENSES,
(3) HOUSEKEEPING
EXPENSES &
(4) INCIDENTAL      $114,666.57
COSTS
SHARP REHABILITA-
TION CENTER, TBI
OUTPATIENT REHA-
BILITATION          13,950.00
SHARP REHABILITA-
TION CENTER LOCA-
TION–SPECIFIC RE-
HABILITATION        26,500.00

The following elements were outlined in the Life Care Plan and were adjusted for inflation and present value in Plaintiff's exhibit 19A, which was admitted without objection by the Defendant:

| | |
|---|---|
| Drugs and Supplies | 42,893.60[7] |
| Home Accessories & Equipment | 14,418.00 |
| Evaluations (physical therapy, occupational therapy, smell/taste, and speech/language) | 3,775.00 |
| Plastic Surgery | 950.00 |
| Regular future medical and dental examinations | 7,566.00 |
| Future medical services | 11,441.00 |
| Future family and marital counseling | 2,700.00 |
| Future dental care | 14,033.00[8] |
| | |
| TOTAL | $252,893.17 |

While the Defendant offered no objection to the admission of the Life Care Plan identified as Plaintiff's exhibit 25, it did urge the Court to adopt the cost estimates contained in Plan A for a companion care/homemaker as opposed to the live-in companion and related food expenses contained in Plan B.[9] The two alternatives were based upon the testimony of the health care providers and other expert witnesses.[10] While different opinions were expressed by these witnesses as to the number of hours per day of home care required, the preponderance of the evidence established that at least 12

---

6. This Life Care Plan was prepared by Sharon Powell Reavis, an expert witness presented by the Plaintiff whose qualifications were stipulated by the Defendant.

7. Testimony at the trial indicated that drug bills through July, 1993 were included in the medical expenses incurred and, accordingly, that portion of Exhibit 19A projecting "Drugs and Supplies" (actually prescription medicines) was adjusted to include the months of August through December, 1993.

8. Outlined in Plaintiff's exhibit 34.

9. The Life Care Plan contained two alternatives: Plan A and Plan B. The only difference in the two plans was the projected cost for a companion/homemaker contained in Plan A as opposed to the projected cost of a live-in companion and related food expenses outlined in Plan B.

10. The Plaintiff and Defendant presented a number of expert witnesses: (1) Dr. John F. Lavach, a neuropsychologist; (2) Dr. Robert I. Solomon, a neurologist; (3) Dr. Nathan Zasler, a physiatrist; (4) Dr. Jeffrey Kreutzer, a neuropsychologist; (5) Peder Melberg, an expert in the field of vocational rehabilitation; (6) Mark Willis, an expert in the field of vocational rehabilitation; (7) Dr. Robin Lewis, a clinical psychologist; (8) Dr. Deborah Abrams, Ph.D., a specialist in rehabilitating brain-injured patients; (9) Sharon Powell Reavis, R.N., a life-care planner; (10) Dr. Thomas Pelligrino, a neurologist; and (11) Dr. Lynn Warner, a neuropsychologist. All of the expert witnesses projected that the Plaintiff would require some degree of care in the home throughout her lifetime. There were no challenges to the qualifications to any of these witnesses.

hours per day of home care would be required. Mrs. Reavis testified that in her opinion the Plaintiff required a 24 hour companion, as outlined in Plan B. Furthermore, Dr. Zasler, who is currently the Plaintiff's primary treating physician, had approved Mrs. Reavis' Life Care Plan.

The Defendant relies upon the testimony of Mark Willis [11] for the proposition that a home companion would be available at an hourly rate of between $4.25 and $10.00 per hour. Mr. Willis concurred with Sharon Reavis that 24-hour care for the Plaintiff would be required. The Defendant conceded in argument that a person available for the minimum wage of $4.25 would not be appropriate and suggested that an appropriate employee could be found in the range of $7.00 per hour. The difficulty with the Defendant's position is that there is no evidence to support a figure of $7.00 per hour. There was testimony by Mrs. Reavis that $8.00 an hour was an appropriate figure for this type of service. Moreover, Susan Kaplan, who performed this type of service for the Plaintiff for five to six months, was compensated at the rate of $8.00 per hour.

However, if a companion/homemaker is hired for 12 hours per day at the rate of $8.00 per hour each day of the year, the cost would approach the projected cost of a full time live-in companion/homemaker as projected in Plan B. Since the person or persons working twelve hours per day would certainly be expected to consume at least two, and possibly three, meals at the home, the food cost projection would be similar for a 12-hour worker and a live-in person. In adopting the alternative of a live-in companion/homemaker, the Court has eliminated the home services cost claimed by the Plaintiff based upon the assumption that this service could be performed by the live-in companion/homemaker.[12] Accordingly, the total cost of the companion/homemaker would not differ significantly from hourly workers performing similar services for 12 hours per day.

In addition to financial considerations there are other reasons why the companion/homemaker alternative is more appropriate under the circumstances of this case. It is not realistic to assume that one person could be employed in the home for 12 hours per day, 7 days per week, 365 days per year, unless that individual actually lived in the Murphy home.[13] At least two people would otherwise be required to divide what amounts to a 96-hour-per-week commitment. Since the purposes of this type of help include lending stability to the Plaintiff's homemaking and childrearing duties, as well as helping her become reintegrated in the community, one person should be able to perform this function more effectively and efficiently than two or more persons.

The Government also argued that if a live-in companion/homemaker is required for 24 hours a day in part because of Mrs. Murphy's inability to perform childrearing functions, then the need for this around-the-clock assistance should terminate when the children reach a particular age. There are a number of shortcomings with respect to the Defendant's position. Firstly, the Defendant has offered no evidence as to what particular age of the children should trigger this change in care. Secondly, the absence of children from the home on a temporary or permanent basis will create an entirely different set of problems for the Plaintiff, including a lack of companionship and a lack of participation in community activities through the children. Thirdly, it is Diane Murphy who is permanently disabled, and, therefore, safety considerations, assistance in taking necessary medications, transportation needs, and the necessity for a "self-starter" will continue throughout her lifetime.

11. It was stipulated at trial that Mr. Willis is an expert in the field of vocational rehabilitation. While Mr. Willis was called as a witness by the Plaintiff, he was originally retained by the United States.

12. An additional reason for the elimination of the cost of housekeeping services is that the Murphy family regularly employed domestic help to perform these type services once a week prior to the accident.

13. Obviously, one person would not be able to fulfill this schedule. Under either alternative, the Plaintiff's husband, other family members, or friends would be expected to relieve the companion from time to time.

The Government also argues that a live-in companion could be hired at an hourly rate with a resultant cost of less than the $36,500.00 current yearly rate set forth in Plan B of the Life Care Plan, which contemplates working through a professional agency.[14] Again, the difficulty with the Government's argument is that there is no evidence upon which to base an hourly or annual rate for such an individual. A further difficulty was pointed out by Mrs. Reavis who testified that it would not be practical for the Plaintiff or the Plaintiff's husband to attempt to select the person to fill this position. Mrs. Reavis opined that an agency specializing in such care must be relied upon to screen the person who will become a part of the Plaintiff's home and a surrogate mother for her children. The transfer of Lt. Murphy to California is illustrative of yet another problem, namely that even if an appropriate long-term employee is located to fill this position, replacements may be necessitated when her husband's naval duties require transfers.

Accordingly, this Court FINDS from a preponderance of the evidence that the Plaintiff requires the services of a live-in companion/homemaker on a 24–hour basis for the remainder of her life. The Court further FINDS from a preponderance of the evidence that the cost of food for such a person is properly estimated in the Life Care Plan. The cost of the live-in companion/homemaker and the cost of food for this person have been properly adjusted for inflation and present value in Plaintiff's exhibit 19A.[15] Furthermore, the number of years is properly based on the evidence relating to Mrs. Murphy's life expectancy. The Court FINDS that the lifetime cost adjusted for inflation and present value of the live-in companion/homemaker is $1,390,510.00, and the cost of food for such a person with similar adjustments would be $107,398.25.[16]

Based upon the evidence as presented at trial, this Court hereby FINDS that the Plaintiff's total special damages include $252,893.17 in expenses to date and projected future expenses, plus $1,390,510.00 and $107,398.25 in live-in companion/homemaker and related food expenses, for a total of $1,750,801.42.

### C. Loss of Earning Capacity

The Plaintiff presented no evidence of lost wages but instead alleged a permanent loss of earning capacity. The Court DOES NOT FIND that the Plaintiff suffered any lost wages, nor is the Court able to quantify the Plaintiff's loss of earning capacity and, accordingly, no element of loss of wages or loss of earning capacity is included in the special damages award.

The Plaintiff claimed an economic loss of $603,538.00 based upon her permanent loss of earning capacity. While the Court FINDS from a preponderance of the evidence that the Plaintiff has proven a permanent loss of earning capacity, the Court cannot accept the economic loss as calculated by the Plaintiff's tendered expert witness, Dr. J. Fremon Jones. Jones testified that the Plaintiff's history of employment as a secre-

---

14. The cost projected is the cost which the Plaintiff would pay to an agency for such services as opposed to the compensation actually received by the individual acting as a live-in companion/homemaker.

    The Plaintiff argues that this annual unit cost should be increased temporarily due to her impending move to San Diego in connection with her husband's transfer to that area by the United States Navy. The evidence indicates that the cost of such services in California is considerably more than the cost for similar services in Virginia and in the rest of the United States. The Court cannot adjust this figure as there is no evidence to indicate how long the Plaintiff's husband may be stationed in San Diego and, in fact, given the exigencies of military service it would be very difficult for anyone to project a time frame. Accordingly, the Court must be guided by the costs which the evidence indicates are appropriate in Virginia Beach, Virginia, and the rest of the country, California excepted.

15. While there will be other incidental costs associated with a live-in person such as physical space in the home, furniture and linens and a means of transportation, Mrs. Reavis stated that she did not have any basis upon which to compute these costs, and there is no other evidence upon which the Court could project such expenses.

16. At the time of trial, Plaintiff did not have any person available to perform the services of a live-in companion/homemaker. Accordingly the figures in exhibit 19A allocated to the year 1993 are adjusted to include only October through December of 1993.

tary for JMB Realty Company in Chicago qualified her for employment as a secretary in the area of Virginia Beach, Virginia, where she was residing at the time of the accident. Based on published figures which the Court found reliable, it was determined that the average wage for a secretary at the locale of Plaintiff's residence was $16,755.00 per annum. Dr. Jones made adjustments for income taxes, anticipated increases in salary based upon cost of living, but not assuming any promotions, and thereafter computed the present value of her annual earnings. The Court FINDS that Jones' computations were reliable and accurate through this point. Jones also calculated that the Plaintiff would have received $3299.00 per annum in fringe benefits associated with this potential employment and made the same adjustments to ascertain the present value of such benefits. While the United States questioned the inclusion of certain items in the fringe benefits package, the computations otherwise appeared reliable and accurate.

Moving to the next stage necessary to quantify the Plaintiff's monetary loss, however, the Court is unable to accept the arbitrary dates selected by Dr. Jones which begin and terminate the yearly computation of the Plaintiff's alleged monetary loss. Jones began computing her yearly earnings loss as of the date of the accident. The Plaintiff had worked as a secretary for a relatively short period of time prior to her marriage, but she had not worked from the time of her marriage, five (5) years earlier, through the date of the accident and there was no evidence that she had planned to return to work on or near the accident date. The Court questioned Jones as to his selection of the date of the accident as the beginning date. Jones answered that Mrs. Murphy's work history made no difference. He testified that he computed the same monetary loss under the circumstances of this particular case as he would have computed had the Plaintiff been regularly employed at the assumed salary and fringe benefits at the time of the accident. When asked why he did not attempt

to ascertain the date when Diane Murphy intended to return to work had the accident not occurred, he replied that any attempt to do so would have been too speculative.

Although Jones admitted that tables were available to compute the normal work life expectancy of individuals such as the Plaintiff based upon age of entry or reentry into the work force, as well as employment and educational history, he declined to utilize such tables. Rather, Jones decided to pick age 65 as the termination date in reliance on the theory that this is the date when most people cease to work. There was no evidence presented by any of the Plaintiff's witnesses that Mrs. Murphy intended to work until age 65 or intended to resume working for any particular number of years.

Counsel for the Plaintiff argued that if the Court did not intend to accept Jones' estimate, it should select the date when Mrs. Murphy's youngest child would enter the first grade as the date when the Plaintiff would have reentered the work force had the accident not taken place. In other words, counsel for the Plaintiff urged the Court to accept Dr. Jones' annual computations of her wage loss but to make its own determination of the period of time during which the Plaintiff would have otherwise been employed, notwithstanding Dr. Jones' professed unwillingness to speculate. The Court is unable to use this method of quantifying the Plaintiff's loss of earning capacity, since the evidence of when she intended to return to work is conflicting and unclear. For example, Lt. Murphy testified that when the children were grown she intended to return to college or work; Dr. Melburg testified that he believed Mrs. Murphy intended to return to work when her youngest child was "school age"; the Plaintiff's mother-in-law testified that Diane Murphy wanted to return to college when the children were "older"; and the Plaintiff's close friend, Mrs. Maureen McFillin, testified that the Plaintiff wanted to get her degree (presumably her college degree as the Plaintiff had completed five semesters) and then return to work.[17]

17. There was testimony indicating that the Plaintiff intended to return to work and save up enough money to return to college and obtain her degree and, thereafter, resume work. In addition, the United States attempted to present through Dr. Staller, its economist, computations

The Plaintiff argues that the Court should determine from the foregoing evidence that the Plaintiff intended to return to work when her youngest child began kindergarten or the first grade. The Plaintiff contends that this is a conservative approach, since she presumably would have earned more than an average secretary's wage if she obtained a college degree. The Plaintiff's economist, however, made no attempt to ascertain from the Plaintiff herself, the Plaintiff's husband, or any other source, whether Mrs. Murphy had any well defined plans regarding her return to work. The Court FINDS that it would be entirely too speculative for it to select a date of reentry into the work force based upon the evidence presented.

As previously noted, the Plaintiff's economist cited no evidence or reliable statistical information to support his assumption that, upon returning to the work force, the Plaintiff would have remained employed until age 65 There was no evidence from other sources indicating the length of time during which the Plaintiff would have remained in the work force when and if she returned to it.

The Court therefore FINDS the monetary loss claimed in Plaintiff's exhibit 19B is unsupported by the evidence and contrary to the controlling law of Virginia [18] and further FINDS that the other evidence upon this issue is insufficient for it to attempt to quantify the Plaintiff's loss of earning capacity.[19]

### D. General Damages

■ In addition to her Special Damages, under Virginia law the Plaintiff is entitled to damages for (1) any bodily injuries sustained and the extent and duration thereof; (2) any effect of any such injuries upon her health according to its degree and probable duration; (3) any physical pain and mental anguish suffered by her in the past, and any which may be reasonably expected to be suffered by her in the future; (4) any disfigurement or deformity resulting to her and any humiliation or embarrassment associated therewith; and (5) any inconvenience and discomfort caused in the past and any which will probably be caused in the future.[20] The

---

which assumed that the Plaintiff would have returned to work part time and thereafter begun working full time. Dr. Staller computed two different totals based upon different scenarios which he stated were based on testimony given by the plaintiff during her discovery deposition. The discovery deposition was not introduced into evidence and there was no evidence at the trial relating to the Plaintiff resuming part-time employment. Accordingly, the Court sustained the Plaintiff's objection to Dr. Staller's testimony in this regard.

**18.** See, e.g., Bulala v. Boyd, 239 Va. 218, 233, 389 S.E.2d 670, 677 (1990) ("[i]n order to form a reliable basis for a calculation of lost future income or loss of earning capacity, such evidence must be grounded upon facts specific to the individual whose loss is being calculated"); see also Greater Richmond Transit Co. v. Wilkerson, 242 Va. 65, 71–72, 406 S.E.2d 28, 33 (1991) (Virginia Supreme Court found that it was error for trial court to permit a vocational rehabilitation counselor to project the plaintiff's lost earning capacity where that witness relied upon information which was inapplicable to that particular individual. Specifically, the witness (1) assumed that the plaintiff would work a 40 hour week for the balance of her working life, even though no evidence was offered at trial that she usually worked a 40 hour week, and (2) based his projections upon wages earned by maids in schools and hospitals, rather than maids in private homes). Since the Plaintiff is proceeding under the FTCA, Virginia law controls this

Court's determination of damages. See Richards v. United States, 369 U.S. 1, 11, 82 S.Ct. 585, 592, 7 L.Ed.2d 492 (1962) (In suits brought under the FTCA, federal courts are required to apply "the whole law of the State where the act or omission occurred"); see also Stancil v. United States, 200 F.Supp. 36, 43 (E.D.Va.1961) (applying Virginia law of damages in action brought under FTCA).

**19.** At one point the Court stated that it did not believe the Plaintiff had presented prima facie evidence of an ascertainable monetary loss grounded upon earning capacity. After hearing further argument from Plaintiff's counsel and reviewing additional authority submitted by Plaintiff's counsel, the Court reconsidered and advised counsel that it would weigh the evidence presented to determine whether such evidence was sufficient to quantify the Plaintiff's loss of earning capacity.

**20.** Under Virginia Model Jury Instruction No. 9.000, a plaintiff may also be entitled to the following: (1) any medical expenses incurred in the past and that may reasonably be expected to occur in the future; (2) any earnings the plaintiff lost because he/she was unable to work at his/her calling; (3) any loss of earnings and lessening of earning capacity, or either, that he/she may reasonably be expected to sustain in the future; and (4) any property damage he/she sustained. The issue of medical expenses was addressed in Sec-

Court treats all of these elements of damage under the topic of "General Damages".

█ In considering the general damages to which the Plaintiff is entitled, the Court will attempt to summarize the evidence which establishes the degree of injury and damage suffered by the Plaintiff. Due to the Plaintiff's almost total loss of short term memory, the Court must look to the testimony of all of the other witnesses and piece together the full extent of the injuries she has suffered.

As a result of the closed head injury which she sustained on August 17, 1990, Diane Murphy's life has been dramatically and irreversibly altered. She continues to be unable to perform most household chores. Prior to the accident she was, by all accounts, an extremely capable wife and mother. She managed the Murphy house single handedly, doing virtually all of the cooking, cleaning, shopping, and caring for the children. Since the accident, however, the Plaintiff has had, and will continue to have, difficulty taking care of her children and herself. She routinely forgets to take her medication, to put soap in the washer, to turn off the stove, to shampoo her hair, and even to drink water. Because of her inability to make simple decisions, Diane Murphy is unable to plan a meal or do the grocery shopping alone. Furthermore, the Plaintiff often falls asleep on the couch during the day, leaving her young children unsupervised for hours at a time.

The injury to Diane Murphy has had a profound impact upon her own existence and the lives of the people around her. Lt. Terrence Murphy has been forced to become both father and mother to the couple's three young children. While Lt. Murphy testified that he had originally intended to remain in the Navy for the remainder of his career, he now believes that this plan may not be possible. Kristen, the Murphy's oldest child, has had to assume additional responsibilities for caring for her younger siblings; she has, in a very real sense, been thrown into the role of a mother at the age of seven. Mrs. Murphy also testified that her middle child, Sean, has become increasingly emotionally unstable

since the accident, often crying for no apparent reason and wetting his bed.

The Murphy's once active social life has become virtually nonexistent. Although Lt. Murphy does still attend an occasional squadron function, he rarely is able to stay for more than an hour or two since his wife is at home with the children. Moreover, as noted in Section I of this opinion, Diane Murphy has been able to remain close with only two of her pre-accident friends, Joanne Dervay and Maureen McFillin. As Mrs. McFillan explained during the trial, Mrs. Murphy's normal speech and physical appearance prevent former friends from being able to understand and appreciate the true nature and severity of her injuries. These problems have taken their toll on the Plaintiff's relationships and her self-esteem.

The importance of Diane Murphy's loss of her ability to drive a car cannot be overstated. It literally and figuratively represents the loss of her independence. This loss of independence in turn has contributed to her problems in maintaining friendships in the community. Mrs. McFillin, wife of her husband's commanding officer, serves as an excellent example. She stated that before the accident she frequently met Diane Murphy for lunch. Following the accident, Mrs. McFillin is required to drive to the Plaintiff's home, which is 45 minutes from her own, ensure that Mrs. Murphy has made arrangements to take care of her children, decide where they should go to lunch, drive them to the restaurant, ensure that Mrs. Murphy has paid for her lunch, drive Mrs. Murphy back to her home, and satisfy herself that things are proper with the Murphy children and household before departing—this only if the Plaintiff even feels capable of going or remembers the engagement. Quite obviously, there are few people willing and able to undertake such complications in order to maintain a friendship.

The health care providers and occupational therapists with whom the Plaintiff has consulted are unanimous in their opinion that Diane Murphy will never be able to return to

tion IIB of this opinion, and earnings and loss of earning capacity have been addressed in Section

IIC. The issue of property damage is not applicable to the instant case.

competitive employment. Expert witnesses defined the term "competitive employment" to mean that type of employment where a person competes with others similarly situated in job performance and opportunities for advancement. Peder Melberg perhaps stated it most clearly and succinctly when he offered the unchallenged opinion that pain, fatigue, and the loss of multiple cognitive functions have completely eliminated her from any opportunity for competitive employment in the future.

It is clear from the evidence that Mrs. Murphy intended to resume her education, or employment, or, in all probability, both. For the reasons described in Section IIB of this opinion, the Court is unable to place a dollar value on the Plaintiff's loss of earning capacity. It is clear, however, that she established by a preponderance of the evidence that she had totally lost the ability to be gainfully employed, which must impact upon her mental anguish.

On the other hand, the Plaintiff has been described as highly motivated to improve herself to the degree possible. She should benefit from rehabilitation, although the degree of improvement is difficult to gauge. While she has probably achieved maximum improvement from a physical standpoint, rehabilitation therapy will probably assist her in adopting strategies to compensate for her loss of various cognitive functions. During the time of her treatment at Head Trauma Rehabilitation, Diane Murphy showed that she could benefit from rehabilitation therapy. When she first began this program she was unable to perform any task which required more than one step. At one point in the therapy she progressed to the point where she could perform a three step function. Unfortunately she discontinued this therapy for reasons apparently related to the Murphys' financial situation. While evidence indicated that her abilities to compensate regressed when the therapy ceased, there was strong evidence that these improvements in her cognitive capabilities could be regained through a resumption of therapy. While her capacity to learn new functions has been severely impaired, repetitive attempts to perform the same function have yielded good results. For this reason, a computer and computer programs for the disabled were recommended as part of her therapy.

The testimony of her physicians has been inconsistent on the issue of whether the Plaintiff is currently suffering from myoclonus or partial seizure disorder. However, the evidence is clear that Mrs. Murphy does have organic brain damage which is permanent in nature and causes this physical anomaly, which, in turn, necessitates permanent medical follow-up and continuous medication. Her medication presents a particular problem in that she will suffer an increase in the number of seizure-type disorders if she does not take her medicine regularly, and her short-term memory deficit is such that any distraction may cause her to forget to take the required medication four (4) times daily, notwithstanding the various forms of reminders which her husband has attempted to utilize.

The Plaintiff and her husband are currently attending family and marital counseling with Dr. Robin Lewis, a clinical psychologist. This form of treatment is expected to continue in accordance with the conservative estimate contained in the Life Care Plan. Diane Murphy testified that her sexual relations with her husband are impaired by a loss of desire and difficulty in achieving satisfaction. Her husband testified that he was unable to have intimate relations with his wife for a period of three months after the accident, and there has been a substantial reduction in both the quality and quantity of such relations since that time.

The Court FINDS Diane Murphy's General Damages to be $1,750,000.00.

### III. CONCLUSION

Based upon the evidence presented, the Court hereby FINDS that the Plaintiff in this action, Diane V. Murphy, is entitled to Special Damages in the amount of $1,750,-801.42. The Court further FINDS that Mrs. Murphy is entitled to $1,750,000.00 in General Damages. Judgment has accordingly been entered in favor of the Plaintiff and against the Defendant in the sum of $3,500,-801.42.

It is clear from the Plaintiff's own testimony, as well as the other evidence in the case, that Diane Murphy is unable to handle her own finances and, therefore, the Court FINDS that a legal guardian must be appointed to act in a fiduciary capacity with respect to the monetary damages awarded to her by the judgment of this Court. It is hereby ORDERED that the Judgment, less the appropriate allowance for attorney's fees and allowable expenses pursuant to the FTCA, be paid to Diane V. Murphy's legal guardian.

It is so ORDERED.