**Ruth S. DANIEL, Plaintiff,**

v.

**Roger W. JONES, M.D., Daniel G. Jenkins, M.D., David C. Pearce, M.D.,**

and

**Williamsburg Obstetrics & Gynecology, P.C., Defendants.**

**No. 4:96CV24.**

United States District Court, E.D. Virginia, Newport News Division.

Feb. 19, 1999.

Henry L. Anderson, Jr., Anderson, Daniel & Voxe, Wrightsville Beach, NC, for plaintiff.

Jason Robert Davis, Carolyn Porter Oast, Heilig, McKenry, Fraim and Lollar, Norfolk, VA, for defendants.

## ORDER

BRADBERRY, United States Magistrate Judge.

This matter is before the Court on defendant David C. Pearce's motion for entry of judgment as a matter of law, and alternatively, for a new trial, and plaintiff's opposition thereto; on defendant's motion for reduction of the verdict pursuant to Federal Rule of Civil Procedure 59 and section 8.01–581.15 of the Virginia Code, and plaintiff's opposition thereto; and defendant's motion pursuant to Rule 83.5, Local Rules for the United States District Court for the Eastern District of Virginia, for leave to speak to trial jurors, and plaintiff's opposition thereto. The motions will be taken in reverse order.

### I. FACTUAL BACKGROUND

This case was tried before a jury on plaintiff's complaint, alleging that she was a victim of medical malpractice as a result of negligent prenatal care. As a result of the allegedly negligent care, she claimed to have experienced premature labor and the delivery of live twin boys, ultimately determined not to be viable, both of whom died within two hours of their birth. (Compl. ¶¶ 23, 25–26.) There is a separate pending cause of action involving the death of the children. This suit was for the negligence experienced by plaintiff, resulting in harm to her, both physical and emotional. (Compl. ¶ 29.)

The suit was originally instituted against Williamsburg Obstetrics & Gynecology, P.C. (hereinafter "the Office"), and three of its physicians, Roger W. Jones, Daniel G. Jenkins, and David C. Pearce. At the conclusion of plaintiff's case, defendants moved for judgment as a matter of law, and the motion was denied. At the conclusion of defendants' case, the motion for judgment as a matter of law was renewed, and granted as to Jones and the Office but denied as to Jenkins and Pearce, to which ruling defendants excepted. At the conclusion of plaintiff's rebuttal evidence, defendants renewed their motion as to Jenkins and Pearce.

Following argument of counsel and the instructions of the Court, the case was submitted to the jury. After deliberating almost four hours, the jury returned with a verdict in favor of Jenkins and against Pearce, awarding plaintiff the sum of Two Million Dollars ($2,000,000.00).

### II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

#### A. The Jury may not be Contacted for any Reason.

This motion arises out of Local Rule 83.5, United States District Court for the Eastern District of Virginia, which reads:

> No attorney or party litigant shall personally, or through any investigator or any other person acting for the attorney or party litigant, interview, examine or question any juror or alternate juror with respect to the verdict or deliberations of the jury in any action, civil or criminal, except on leave of court granted upon good cause shown and upon such conditions as the court shall fix.

Defendant seeks permission of the Court to interview members of the jury with regard to the verdict, articulating as the reason the length and complexity of this trial and a pending state trial involving all of the original defendants herein, reasoning that "it would be beneficial to gain the insights of the jurors in this case, in an attempt to resolve the pending litigation." (Defs.' Mot. Rule 83.5 at 1.)

It could be argued, in any case, that there is a benefit to be gained by virtue of the jury's observations. Nevertheless, in this district, such a course has been rejected and for good reason. Jurors are asked to make a sacrifice of their time, leaving their families and their professions to resolve a dispute between strangers. At the conclusion of the case, they have earned the right to return to their normal lives without fear or concern of attorneys, or attorneys' representatives, knocking on

their door or calling them at home in the evening to question them about the whys and wherefores of their respective verdicts.

Judges in this district have had years within which to reconsider their position on this topic and have chosen not to. The administration of civil justice in this district is unique in many respects, not the least of which is our respect for the work that juries do, and their right to keep their proceedings confidential, save in the most unusual of circumstances. Those circumstances do not exist in the case before the Court, and the motion is DENIED. The jurors may not be contacted for any reason whatsoever.

### B. Defendant's Motion to Reduce the Verdict.

■ Defendant has also moved for entry of an order reducing the jury verdict, citing in support thereof two reasons: First, that the verdict "is excessive and unsupported by the record"; and second, that Virginia's substantive law, which governs this case, see *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Va.Code Ann. § 8.01–581.15 (Michie 1998), establishes a medical malpractice cap in the sum of One Million Dollars ($1,000,000.00) as the total amount recoverable against a health care provider in an action for medical malpractice. (Defs.' Mot. Reduce Verdict at 1.)

The medical malpractice cap has been upheld as constitutional under Virginia law. In addressing the issue in *Etheridge v. Medical Ctr. Hosps.*, 237 Va. 87, 376 S.E.2d 525 (1989), the Supreme Court of Virginia noted:

Based upon its study, the General Assembly found that the increase in medical malpractice claims was directly affecting the premium cost for, and the availability of, medical malpractice insurance. Without such insurance, health care providers could not be expected to continue providing medical care for the Commonwealth's citizens.

Because of this threat to medical care services, the General Assembly, in 1976, enacted the Virginia Medical Malpractice Act.

*Id.* at 93, 376 S.E.2d 525. The court went on to quote from the preamble to the Act, which finds as a legislative fact that the difficulty in requiring insurance has reduced the number of health care practitioners in Virginia and that such an effect constitutes a significant problem which affects the health of the citizenry and necessitates a limitation on liability. *Id.*

Rejecting claims that plaintiff was denied her right to a jury trial, that she was denied the right to due process, that the Act violates the doctrine of separation of powers set forth in Article III of the Virginia Constitution, that the Act constitutes special legislation favoring a particular class of persons, and that the statute violates the Equal Protection Clause of the Fourteenth Amendment to the federal Constitution, the court found the medical malpractice cap constitutionally sound. *See id.* at 95–104, 376 S.E.2d 525. Since that time, it has applied its rulings, in upholding the cap, consistently. *See Schwartz v. Brownlee*, 253 Va. 159, 482 S.E.2d 827, 832 (1997); *Fairfax Hosp. Sys. v. Nevitt*, 249 Va. 591, 457 S.E.2d 10, 14–15 (1995); *Bulala v. Boyd*, 239 Va. 218, 389 S.E.2d 670, 674–75 (1990).

The Virginia rule has been enforced in this circuit. In *Power v. Alexandria Physicians Group, Ltd.*, 887 F.Supp. 845 (E.D.Va.1995), Judge Ellis, referring to the statute, stated:

This plain and unambiguous statutory language announces the principle dispositive here: an injured patient may recover no more than $1 million for injuries arising from one malpractice event. And, as the language also reflects, this principle holds whether the patient sues one defendant or many, whether she files one action or several separate ones, or whether she proceeds under more than one legal theory or cause of action

constituting "an action for malpractice" under the statute. Moreover, a patient cannot avoid the $1 million cap by characterizing each of the health care providers' mistakes that contribute to her injury as a separate instance of malpractice. The statute, which was intended to assure affordable medical malpractice insurance by limiting health care providers' liability, would be ineffective and would not achieve its purpose if recovery could be multiplied as easily as Power suggests. In sum, one claimant, with one indivisible malpractice injury, is subject to a single $1 million cap on her malpractice damages.

*Id.* at 848–49 (footnotes omitted).

For the foregoing reasons, the Court reduces the jury's judgment to One Million Dollars ($1,000,000.00) in conformity with the statutory limitations of section 8.01–581.15 of the Virginia Code. Whether this sum should be further reduced will be addressed later.

## C. Defendant is not Entitled to Judgment as a Matter of law Pursuant to Rules 50(b)(1)(B), 50(b)(1)(C), and 50(c) nor is Defendant Entitled to a new Trial Under the Provisions of Fed.R.Civ.P. 59.

Defendant advances three theories in support of the motion for judgment as a matter of law, pursuant to Rule 50, or for a new trial, pursuant to Rule 59. First, defendant asserts that plaintiff never pled or produced expert testimony establishing a physical injury to her arising from Pearce's negligence. (Defs.' Mem. Supp. Mots. at 3.) Second, defendant contends that plaintiff never established a causal relationship through expert testimony between the alleged violation of the standard of care and the physical injury plaintiff experienced. (Defs.' Mem. Supp. Mots at 11.) Finally, defendant alleges that one of plaintiff's experts, Dr. Dillard, was not qualified to address the standard of care issues faced by Pearce in the treatment of plaintiff. (Defs.' Mem. Supp. Mots. at 13.)

### 1. Background

In 1994, plaintiff and her husband decided that they were ready to have children. (Tr. Sept. 15, 1998, at 64.) In September of that year, plaintiff became pregnant, but the pregnancy was short lived as she spontaneously aborted soon after she discovered she was pregnant. (Compl. ¶ 8.) Following her miscarriage, but before the onset of a new menstrual cycle, plaintiff again became pregnant. (Compl. ¶ 8.) While there was an issue of fact with regard to the gestational age of her children at the time she delivered, it appeared that the pregnancy occurred in the latter part of October or the first week in November.

At the time, plaintiff was in the care of the Office, and her principal physician was Dr. David C. Pearce, although she was aware that Pearce's partners, Roger W. Jones and Daniel G. Jenkins, would also furnish her treatment since the doctors work on a rotating call basis in order to meet the needs of their practice. On November 15, 1994, Pearce had his first contact with plaintiff and at that time performed an ultrasound using a vaginal probe. (Tr. Sept. 15, 1998, at 70.) He was unable to detect a heart beat. (Tr. Sept. 29, 1998, at 45.) Pearce testified that this indicated to him that plaintiff was less than six weeks pregnant at the time. (Tr. Sept. 29, 1998, at 45.)

On January 12, 1995, plaintiff saw her physician and received an abdominal examine during which time the fetuses were felt, though no one yet knew she was carrying twins. (Tr. Sept. 15, 1998, at 77.) However, an AFP test, which was performed to determine her risk for certain birth defects, was low, signifying a potentially increased risk for Down's Syndrome. Accordingly, an ultrasound was ordered. (Tr. Sept. 15, 1998, at 78.) On January 20, 1995, the ultrasound was performed, and plaintiff and her husband learned, for the first time, that she was carrying twins. (Tr. Sept. 15, 1998, at 78.) The development of the fetuses appeared to be normal,

and there were no particular problems discussed with the parents. (Tr. Sept. 15, 1998, at 78–80.)

Plaintiff was subsequently seen on February 9, 1995, by Jones, and on February 23, 1995, by Pearce. There was no discussion during either visit of any increased risk to which plaintiff was exposed as a result of the fact that she was carrying twins. According to Pearce, that would not have been discussed until she was further along in her pregnancy at which time it may have been appropriate to discuss an increased risk for delivery by Caesarean section. (Tr. Sept. 29, 1998, at 80–81.)

On March 7, 1995, plaintiff went in and was seen by Jones. This was an unscheduled visit. (Tr. Sept. 15, 1998, at 86.) According to plaintiff, on March 7, 1995, she had a hard stomach and back pain, was experiencing what she thought were contractions, and was suffering from vaginal itching which she attributed to a vaginal yeast infection. (Tr. Sept. 15, 1998, at 86–87.) She testified, and Jones confirmed, that a pelvic examination was done. (Tr. Sept. 15, 1998, at 87.) As a result of the examination, Jones concluded that she was not in preterm labor and prescribed a cream to address the itching. (Tr. Sept. 15, 1998, at 89.) Jones found plaintiff to be in a stable, nonpreterm labor condition, and felt no particular reason to communicate the results of his examination to his partners.

Plaintiff described a continuing pain, present when she saw Jones, that basically went unrelieved. On Saturday, March 11, 1995, she went to a baby shower but did not stay because she was in too much pain. (Tr. Sept. 15, 1998, at 91.) On Sunday, March 12, 1995, the pain was elevated and became severe. (Tr. Sept. 15, 1998, at 92.) According to plaintiff, she described the pain as becoming "a different kind of back ache," and on that date, she called the weekend number for the Office to talk to a doctor. (Tr. Sept. 15, 1998, at 92–93.) Her call was returned by Jenkins who was on call. (Tr. Sept. 15, 1998, at 93.) Plain-

tiff told Jenkins about her severe back pain and that she thought she was having contractions. (Tr. Sept. 15, 1998, at 94–95.) She was told to take aspirin and to call the office the following morning, Monday, if the pain persisted. (Tr. Sept. 15, 1998, at 95.) Plaintiff testified that Jenkins did not express a need to perform a pelvic examination, did not instruct her to come in to the office the following morning, did not inform her of any risk incident to her pregnancy, and did not convey anything to her which indicated she was having other than a normal pregnancy. (Tr. Sept. 15, 1998, at 95–96.) According to Jenkins, plaintiff had back pain and a hard abdomen. (Tr. Sept. 30, 1998, at 24.) He testified that he asked plaintiff if she was having contractions, and she said she did not know but that her stomach was hard all the time. (Tr. Sept. 30, 1998, at 26.) It was Jenkins' opinion that plaintiff was not in labor and that it was not necessary to have her come to the hospital. (Tr. Sept. 30, 1998, at 27.) He essentially confirmed her testimony about being told to take aspirin and call the following morning. (Tr. Sept. 30, 1998, at 27–28.) According to Jenkins, the entire conversation took about three minutes. (Tr. Sept. 30, 1998, at 28.)

Plaintiff testified that she continued to be in pain and that the pain continued to intensify. (Tr. Sept. 15, 1998, at 103.) On March 13, 1995, the pain was severe enough that plaintiff, a teacher, called a substitute to take her class. (Tr. Sept. 15, 1998, at 97.) However, it is conceded that she did not call the doctor's office nor did she go in for an examination. (Tr. Sept. 15, 1998 at 39.)

On March 14, 1995, plaintiff went to work but was experiencing so much pain that she had to lay down on the floor before the children came to the class room. (Tr. Sept. 15, 1998, at 101.) She worked only a half a day and stayed in the nurse's office for a significant period of time, trying to find relief from the pain that she was experiencing. (Tr. Sept. 15, 1998, at

102–03.) When she walked, she had to hold on to a chair. (Tr. Sept. 15, 1998, at 103.) That evening, at about 9:30 p.m., plaintiff experienced a vaginal discharge. (Tr. Sept. 15, 1998, at 103.) She was so upset by the event that she asked her husband to call the emergency number for the Office. (Tr. Sept. 15, 1998, at 104.) The call was returned by Pearce, her principal physician. (Tr. Sept. 15, 1998, at 104.) According to the Office's scheduling practice, Pearce was on call from 12:30 p.m. on March 14, 1995, until that same time the next day, March 15, 1995. (Tr. Sept. 30, 1998, at 16–18.)

At this point there are conflicts in the testimony. Plaintiff testified that she heard her husband talking to Pearce and that she then spoke to Pearce herself. (Tr. Sept. 15, 1998, at 105–06.) Pearce testified that he spoke only to plaintiff's husband. (Tr. Sept. 29, 1998, at 85.) In any event, Lewis Daniel testified that both he and plaintiff were concerned about preterm labor after reviewing the book on pregnancy that had been given to them by Pearce. (Tr. Sept. 14, 1998, at 43–44.) They concluded that the discharge may have signified that plaintiff was experiencing preterm labor, and this fact was conveyed to Pearce who asked if plaintiff was having contractions. (Tr. Sept. 14, 1998, at 44.) Lewis Daniel said he gave the phone to plaintiff to talk to Pearce and heard her relay to Pearce the same symptoms he had already described. (Tr. Sept. 14, 1998, at 44.) In addition, he heard plaintiff tell Pearce that she had had diarrhea for several days and ask if she needed to go to the hospital. (Tr. Sept. 14, 1998, at 45–46.)

Pearce's recollection was slightly different. He testified that plaintiff's husband told him that she had had a back ache for five days and a slimy discharge that evening at about 11:00 p.m. (Tr. Sept. 29, 1999, at 85.) Pearce testified that he asked Lewis Daniel if his wife was having any abdominal pains or cramping and was told that she was not. (Tr. Sept. 28, 1998, at 85.) When Pearce asked to talk with plaintiff, he was told she was resting. (Tr. Sept. 29, 1998, at 85.) Pearce said there was no mention of diarrhea or Braxton–Hicks contractions. (Tr. Sept. 29, 1998, at 85–86.) The latter fact was significant because, he was trying to determine if plaintiff was in preterm labor. (Tr. Sept. 29, 1998, at 86.) Based on what had been told to him, he concluded that she was not in preterm labor and that it was not necessary to see her that evening. (Tr. Sept. 29, 1998, at 87.) At trial, Pearce testified that if he had been told the symptoms claimed by plaintiff and Lewis Daniel, he would have had them go to the hospital immediately for an examination but that he did not, on the evening of March 14, 1995, believe that plaintiff was at risk. (Tr. Sept. 29, 1998, at 158.)

According to the testimony of plaintiff and Lewis Daniel, on the morning of March 15, 1995, plaintiff woke in extreme pain, laying on the floor. (Tr. Sept. 15, 1998, at 4–5.) She was in so much pain that she was unable to finish her shower. (Tr. Sept. 15, 1998, at 4.) Lewis Daniel became so concerned about plaintiff that he immediately called the Office. (Tr. Sept. 15, 1998, at 5.) When there was no return call, plaintiff expressed a need to be taken to a hospital. (Tr. Sept. 15, 1998, at 5.) Accordingly, Lewis Daniel put plaintiff in their car and proceeded to Walter Reed Hospital in Gloucester, Virginia. (Tr. Sept. 15, 1998, at 5.) Lewis Daniel testified that he went to Walter Reed because he had heard on the news that morning that there was a back-up on the Coleman Bridge, along the most direct route to defendants' office, and he did not want to be held up in traffic while plaintiff was experiencing the pain she described. (Tr. Sept. 14, 1998, at 47.)

Both plaintiff and Lewis Daniel testified that at Walter Reed, plaintiff was examined by Dr. Parilla, an emergency room physician, who did a very brief internal examination and then attempted to contact plaintiff's physicians. (Tr. Sept. 15, 1998,

at 7.) An emergency medical technician, Margaret West, happened to be at the hospital, and at some point went into the examining room to try and help plaintiff who was in extreme discomfort. (Tr. Sept. 14, 1998, at 51.) At approximately 9:30 a.m., Parilla was able to reach Jones and discussed plaintiff's condition with him. (Tr. Sept. 14, 1998, at 57.) Based upon Jones' instructions, Lewis Daniel placed plaintiff in their car and drove her to the Office. (Tr. Sept. 15, 1998, at 11–12.)

The evidence revealed that there was apparently an error on the part of the answering service used to direct telephone messages to the physician on call. (Tr. Sept. 30, 1998, at 16–19.) Pearce was on call and remained on call until 12:30 p.m. on March 15, 1995, but he was never contacted. (Tr. Sept. 30, 1998, at 16–19.) Instead, attempts were made to call Jenkins, who did not have his pager with him. (Tr. Sept. 30, 1998, at 64.) Ultimately, Jones was reached at the office and directed that plaintiff be brought from Walter Reed Hospital by car to Williamsburg. (Tr. Sept. 30, 1998, at 5; 17.) Pearce was notified by Jones that plaintiff was coming in. (Tr. Sept. 30, 1998, at 5.)

Jones testified that he received a call from Walter Reed about 9:15 a.m. and expressed surprise since plaintiff was farther away than if she had been at home, and Walter Reed has no obstetric facilities. (Tr. Sept. 30, 1998, at 5–7.) According to Jones, Parilla did not know if plaintiff was having contractions but found that her cervix was closed, and her white blood cell count was elevated. (Tr. Sept. 30, 1998, at 9; 16–18.) However, Margaret West, the EMT, testified that she could feel the stomach tightening and relaxing, indicating that plaintiff was having contractions. (Tr. Sept. 15, 1998, at 9.) In West's opinion, plaintiff was in preterm labor. (Tr. Sept. 15, 1998, at 11.) She further testified that she had delivered babies, was trained in the delivery of babies, and was taught to recognize both preterm and regular labor. (Tr. Sept. 15, 1998, at 2–5.) Following the

discussion with Parilla, and being satisfied that plaintiff was not in preterm labor, Jones directed that plaintiff be brought to the Office. (Tr. Sept. 30, 1998, at 17–18.) In route to the Office, plaintiff's water broke, and she began active delivery. (Tr. Sept. 15, 1998, at 12.) When plaintiff arrived at the Office, she was intercepted by Pearce and carried to the Williamsburg Memorial Hospital by ambulance. (Tr. Sept. 30, 1998, at 18.)

Pearce testified that plaintiff arrived at the Office at 10:28 a.m., she left in the ambulance at 10:37, she arrived at the hospital at 10:41, the first baby was delivered at 10:48, weighing 505 grams, and the second baby was delivered at 10:50, weighing 530 grams. (Tr. Sept. 29, 1998, at 93–96.) Each of the infants was small (17.7 oz. and 18.5 oz. respectively), their eyelids were fused, their skin was translucent, and both had heartbeats. (Tr. Sept. 29, 1998, at 96.) Pearce said that he was very surprised when his patient arrived at the Office ready to deliver. (Tr. Sept. 29, 1998, at 97.)

Preterm delivery had not been anticipated, and there were no neonatal preparations. (Tr. Sept. 29, 1998, at 98.) Because of the lack of development, neither infant was considered viable. Each of the children lived for a brief period of time and expired naturally. (Tr. Sept. 15, 1998, at 15–17.) No efforts were made to resuscitate the children. (Tr. Sept. 15, 1998, at 16.)

While plaintiff alleged innumerable acts of negligence on the part of the corporate defendant and the three physicians, her case arises out of the alleged failure of all of the defendants to recognize and treat preterm labor, resulting in her traumatic, preterm delivery and the death of both infants who were born alive. Anticipating defendants' case in part, plaintiff began her medical evidence with the testimony of Dr. Rosalinda Parilla, a pathologist at Williamsburg Community Hospital. R. Parilla testified that she examined the placenta delivered by plaintiff and found no

abnormalities or evidence of disease. (Tr. Sept. 16, 1998, at 70–71.)

Plaintiff's case was supported by the testimony of Dr. Robert Dillard, a neonatologist from Wake Forest Medical School, who testified that in his opinion, the standard of care was violated when the physicians did not recognize that plaintiff was going into preterm labor and take adequate steps to prevent preterm labor from occurring. (Tr. Sept. 17, 1998, at 209–10; 215; 219–21.) It was his testimony that had they administered tocolytic drugs, subjected plaintiff to bed rest, and done other things, that the delivery could have been postponed at least long enough for the fetuses to have been born in a viable state, though they would have been premature. (Tr. Sept. 17, 1998, at 249–51.)

Defendants countered with expert testimony rejecting the notion that plaintiff was in preterm labor, based at least in part on the medical records of Parilla, the emergency room physician, who determined that when plaintiff presented at the Walter Reed Hospital on the morning of March 15, 1995, the cervix had not dilated. (Tr. Sept. 30, 1998, at 16.) Neither side called him to the stand. Parilla's record was supplemented by the expertise of a placental pathologist who testified that plaintiff's placenta reflected the presence of acute chorioamnioitis, a placental infection which, under the best of circumstances, may cause premature delivery. (Tr. Sept. 18, 1998, at 33–35.) Defendants also introduced extensive evidence to establish that tocolytic drugs would have been unavailing at the state in plaintiff's pregnancy when preterm labor commenced, that measures designed to prevent preterm labor are frequently unsuccessful, and that the condition of the fetuses, when born, reflected such a degree of developmental immaturity that the attending physician could not do anything other than permit the infants to expire. (Tr. Oct. 1, 1998, at 35–39.)

Defendants further argued that plaintiff was contributorily negligent for not calling her physicians between the 12th and the 14th of March, when her hard stomach and extreme pain persisted, and that she assumed a risk of preterm delivery, given her symptoms on the morning of March 15, 1995, when she proceeded to Walter Reed Hospital, a facility not equipped with an obstetrics unit, instead of proceeding to the Office.

Plaintiff countered both arguments, first by introducing their own placental pathologist, who confirmed R. Parilla's findings at Williamsburg Community that no chorioamnioitis was present in the placenta and second, that the only reason she went to Walter Reed was because of a traffic backup on the Coleman Bridge, the connecting bridge between Gloucester County and the roads leading to Williamsburg where the Office and the hospital are located. At the conclusion of all of the evidence, the case was submitted to the jury resulting in the verdicts previously described.

### 2. *Applicable standards*

The applicable standards for granting a motion for judgment not withstanding the verdict, pursuant to Rule 50, and for a new trial, pursuant to Federal Rule of Civil Procedure 59, have recently been addressed by the Fourth Circuit. Speaking in *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294 (4th Cir.1998), Judge Murnaghan addressed the issue of judgment notwithstanding the verdict, stating:

> Pursuant to Fed.R.Civ.P. 50(b), a district court may grant JNOV "if there is no legally sufficient evidentiary basis for a reasonable jury to find for the [non-moving] party...." On appeal, we will affirm a denial of JNOV if, "giving [the non-movant] the benefit of every legitimate inference in his favor, there was evidence upon which a jury could reasonably return a verdict for him...." *Abasiekong v. City of Shelby et al.*, 744 F.2d 1055, 1059 (4th Cir.1984) (quoting *Mays v. Pioneer Lumber Corp.*, 502 F.2d 106, 107 (4th Cir.1974)). In making this determination, we are not permitted to retry factual findings or credi-

bility determinations reached by the jury. *See Duke v. Uniroyal, Inc.,* 928 F.2d 1413, 1419 (4th Cir.1991). Rather, we are to assume that testimony in favor of the non-moving party is credible, "unless totally incredible on its face," and ignore the substantive weight of any evidence supporting the moving party. *Id.* at 301.

The court went on to address the issue of a motion for a new trial pursuant to Rule 59, stating:

A new trial will be granted if '(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.' *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.,* 99 F.3d 587, 594 (4th Cir.1996). 'The decision to grant or deny a new trial is within the sound discretion of the district court....'

*Id.*

■ Accordingly, applying that standard to the case before the Court, it is the Court's obligation to determine whether there is "evidence upon which a jury could reasonably return a verdict for" plaintiff. The Court must also determine whether the verdict which was rendered "is against the clear weight of the evidence," a determination consistent with the duty of the Court to determine if the evidence would support a verdict, or if the verdict "is based upon evidence which is false," a nonissue in this case, or "will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict," likewise a nonissue in this case. It is, therefore, appropriate to consider the arguments made by defendant.

**D. Plaintiff has Pled and Produced Expert Testimony that she Suffered From Physical Injury as a Result of Defendants' Negligence.**

■ The Court begins by examining the pleadings. While defendant has suggested that Paragraphs 25 and 29 allege only that plaintiff was injured as a result of the premature birth and subsequent death of her twins, a closer reading of the complaint reveals more:

25. Due to the negligence of the defendants, ROGER W. JONES, M.D., DANIEL G. JENKINS, M.D., DAVID C. PEARCE, M.D., and WILLIAMSBURG OBSTETRICS & GYNECOLOGY, P.C., in failing to properly diagnose and treat plaintiff from her first visit continuing through delivery of the twins on March 15, 1995, plaintiff's infant children were negligently and carelessly caused to suffer premature birth and subsequent death.

. . . .

29. As a direct and proximate result of the defendants' failure to comply with the applicable standards of care and of the defendants' negligence as aforesaid, plaintiff, *RUTH S. DANIEL, suffered great pain of body and mind; severe emotional distress by having premature labor and witnessing the death of her prematurely born infant twins, dying while in her arms; and a lifetime of enjoyment of her twin baby boys.*

(Compl. ¶¶ 25 and 29 (emphasis added).)

It is plain from the pleadings that plaintiff complains that she was the victim of the failure of the standard of care by the physicians in failing to properly diagnose and treat her, and as a result of that fact, she was caused great pain, physically and mentally. The complaint also alleges that plaintiff was caused to prematurely deliver the children who subsequently died and that she has been severely, emotionally distressed by experiencing the premature labor and birth of her children, by observing the death of her prematurely born infants, and by being deprived of the enjoyment of the children.

Plaintiff has quoted from an order of the Court entered September 4, 1998. A portion of the order follows:

[t]he Court is satisfied that a motion for summary judgment on the facts alleged is entirely inappropriate. The Court expects, from the pleadings, that the evidence will show that for at least a week prior to the time plaintiff prematurely delivered her twins, plaintiff experienced a number of symptoms which, with the perfect clarity of hindsight, were obviously related to the pending premature delivery. The nature of the response of her physicians to those symptoms and signs is the core of this case. In that week, preceding her premature delivery, plaintiff suffered cramping, diarrhea, low back pain, an unusual discharge, and other discomfort. On the morning of her delivery, plaintiff was rushed to Walter Reed Medical Hospital in extreme pain; she was unable to contact her physicians; and once they were contacted, she was carried in extreme pain in the back of an automobile across the Coleman Bridge from Gloucester, Virginia to the offices of her physicians in Williamsburg, Virginia, where she was found to be in the middle of delivery. From that point, plaintiff was carried by ambulance to the hospital where her children were delivered. Shortly after their delivery, the children died, with no efforts made to keep them alive. Plaintiff suffered an extremely difficult pregnancy, a lot of pain, the loss of two infants, and the knowledge that no effort was maintained to keep them alive. On the facts alleged, plaintiff has suffered physical pain, injury, and resultant mental anguish and pain arising from the loss of the two infant boys.

(Ct. Order September 4, 1998, at 6–7.)

As it turned out, the words that the Court set forth in the Order of September 4, 1998, were significantly borne out by the testimony at trial. The record is replete with testimony describing the pain experienced by plaintiff between March 7, 1995, and the delivery date, March 15, 1995. Plaintiff testified, and her husband confirmed, that during the week before the delivery of the children she continued to experience a hard stomach and pain in her back, the principal reasons why she went to the doctor on March 7, 1995, in addition to some vaginal itching. (Tr. Sept. 15, 1998, at 86–87.) On the Saturday before the delivery, March 11, 1995, plaintiff was in so much pain that she had to leave a social engagement early. (Tr. Sept. 15, 1998, at 91.) The next day, March 12, 1995, the pain was increasing and began to feel like menstrual cramps, resulting in a call to her physicians. (Tr. Sept. 15, 1998, at 92–93.) Her concerns were addressed by Jenkins, who did not feel that an internal examination was necessary. (Tr. Sept. 30, 1998, at 26–27.) The pain did not subside, and on March 13, 1995, she had to call a substitute to teach for her, leaving school early because she could not continue to function. (Tr. Sept. 15, 1998, at 97.) Her testimony was that she was in so much pain that she went by her husband's office to get him to follow her home to assure that she got there safely. (Tr. Sept. 15, 1998, at 98–100.) She had a bad night, and the following day, March 14, 1995, she spent much of her time at work on her back because of painful cramping in her lower back. (Tr. Sept. 15, 1998, at 102–03.) When she walked, plaintiff had to hold on to a chair, and she spent two and one-half hours on a couch in the nurse's office trying to get relief from the pain she was experiencing. (Tr. Sept. 15, 1998, at 102–03.) That night about ten o'clock she experienced a vaginal discharge and was so distressed by the occurrence that she had her husband call her physician. (Tr. Sept. 15, 1998, at 103–04.) On that occasion, Pearce responded. (Tr. Sept. 15, 1998, at 104.) There is conflict in the evidence about whether Pearce spoke only to Lewis Daniel or to Lewis Daniel and then plaintiff. It is uncontroverted that he did not order an internal examination, direct that she go to the hospital, or come to his office for treatment. (Tr. Sept. 29, 1998, at 87.)

Plaintiff testified that on the following morning, March 15, 1995, she was in so

much pain she could not even finish her shower. (Tr. Sept. 15, 1998, at 4.) Plaintiff's husband found her on the floor. (Tr. Sept. 15, 1998, at 4–5.) She was hurting so badly that when her husband was unable to reach her doctors by phone, she asked him to take her to a hospital. (Tr. Sept. 15, 1998, at 5.) Lewis Daniel corroborated his wife. He testified that he heard on the television of a traffic back-up on the Coleman Bridge and was so concerned about plaintiff that he elected to go to Walter Reed Hospital, located in Gloucester, in order to avoid being caught in traffic. (Tr. Sept. 14, 1998, at 47.) At Walter Reed, plaintiff was in so much pain that it was extraordinarily difficult for the people at the hospital to afford any treatment to her, although Parilla did perform a cervical examination. However, when a nurse tried to take her vital signs for a second time, plaintiff was unable to comply because of her pain. (Tr. Sept. 15, 1998, at 14.)

When the decision was made that she was to go to the Office, no ambulance was ordered. Instead, her husband and Margaret West helped her into the Daniel's car, partially dressed because she could not even put her clothes back on. (Tr. Sept. 15, 1998, at 15.) While in route, laying in the back seat of their automobile and going over the Coleman Bridge, she felt her water break. (Tr. Sept. 15, 1998, at 12.) According to Pearce's testimony, plaintiff arrived at the Office at 10:28 a.m., left for the hospital at 10:37 a.m., and delivered her first child at 10:48 a.m. (Tr. Sept. 29, 1998, at 93–96.) West's opinion that plaintiff was having contractions in the Walter Reed emergency room was confirmed by the subsequent and rapid delivery of her twins. Plaintiff then experienced the trauma of being able to hold each of her children, see their fused eyes and translucent skin, and experience their death shortly after their birth.

The extent and duration of her pain was corroborated by her husband who experienced all of the events that she testified to except those which occurred exclusively at school. Her testimony regarding her time at school was corroborated by two friends, Roberta Shiflett and Kim Price, who taught school with her. Plaintiff's symptoms at Walter Reed were corroborated by West's testimony who was present on the morning of March 15, 1995.

Plaintiff's expert, Dr. Robert Dillard, a neonatologist, testified that in his opinion, all of the defendants violated the standard of care for a variety of reasons. (Tr. Sept. 17, 1998, at 209–10; 215; 219–21.) The most significant reason was their collective failure to diagnose plaintiff's symptoms of preterm labor and take those steps which would have precluded labor from occurring or would have at least deferred the onset of labor long enough to allow the fetuses to develop to the point of viability.

The Court understands the nature of the argument made by defendant, which comes from the following testimony of Dillard:

> The sum of those breaches of the standard of care resulted in Mrs. Daniel's preterm birth of twins, and the subsequent chain of events that took place after the birth led to their death, and their death and the subsequent medical problems that Mrs. Daniel had were caused by the breaches in standard of care.

(Tr. Sept. 17, 1998, at 220–21.) If that was all of the evidence, the Court would conclude that there was an insufficient nexus to support evidence of an injury and resulting harm. However, Dillard did not make that statement in a vacuum. In testimony which was pursued meticulously, he went through the entire course of plaintiff's pregnancy, giving special emphasis to the dates in which she saw or talked with her physicians in March, 1995: March 7, 12, 14, and 15. Specifically, he testified that on March 7, 12, and 14, the standard of care was violated by not having a more thorough examination of plaintiff done, by not having more extensive testing done, and by not beginning specific fetal monitoring to determine whether she was en-

tering preterm labor. (Tr. Sept. 17, 1998, at 209–10.)

The evidence presented to the jury left no doubt that plaintiff was in excruciating pain for days before her ultimate delivery on March 15, 1995; that she was relying upon her physicians to advise her by virtue of her calls and communication to her physicians about her condition, which was progressively worsening; that the only reason she did not go to the hospital before March 15, 1995, was that her physicians did not appear to think such action was necessary; and that when she went to the hospital on March 15, 1995, it was only as a result of her body telling her that the process of delivery was beginning, a fact that she did not necessarily recognize but that the physicians should have. There is "evidence upon which a jury could reasonably return a verdict for" plaintiff.

### E. Through Dillard's Testimony, plaintiff has Established a Breach of the Standard of Care and the Causal Relationship Between the Breach and the Physical Injuries Experienced by Plaintiff.

■ Dillard's testimony has been discussed, in some detail in the preceding section and need not be repeated here. Suffice it to say that Dillard testified about a breach and the direct causal relationship between the breach and plaintiff's physical and emotional experiences.

Accepting, as valid, defendant's argument that in Virginia there is a "but for" rule, *see Wells v. Whitaker*, 207 Va. 616, 151 S.E.2d 422, 428 (1966), there was sufficient evidence in this case for a jury to find that Pearce's conduct was more likely than not the cause of the injury and loss sustained by plaintiff. It is further inaccurate to suggest that it is only the collective attribution of negligence, attributable to all of the defendants, that establishes the violation of any standard of care in the case.

While Dillard testified about a number of failures of the standard of care, the most critical aspects of his testimony dealt with the failures of defendants to adequately examine plaintiff in response to her symptoms as she got closer to what was ultimately to be her delivery date. Specifically, he testified that Jenkins, having been given the symptoms that he was given on March 12, 1995, violated the standard of care by not having her examined that evening, and further that on March 14, 1995, Pearce violated the standard of care, essentially ignoring the symptoms that had been ongoing for some period of time and failed to have plaintiff examined at that time, rather than in the morning. (Tr. Sept. 17, 1998, at 215–76; 219–21.) By establishing the connection, plaintiff created a *prima facie* case.

### F. Dillard was Qualified to Express a Standard of Care.

■ The final argument presented by defendant is that Dillard, a neonatologist, was not qualified to testify about the standard of care in an obstetrical case. In this regard, it is critical to examine the Virginia statute governing the qualifications of an expert witness:

Any physician who is licensed to practice in Virginia shall be presumed to know the state wide standard of care in the specialty or field of medicine in which he is qualified and certified. This presumption shall also apply to any physician who is licensed in some other state of the United States and meets the educational and examination requirements for licensure in Virginia. An expert witness who is familiar with the state wide standard of care shall not have his testimony excluded on the ground that he does not practice in this Commonwealth. *A witness shall be qualified to testify as an expert on the standard of care if he demonstrates expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards and if he has had active clinical practice in either the defendant's specialty or a related field of medicine within one year of the*

*date of the alleged act or omission forming the basis of the action.*

Va.Code Ann. § 8.01–581.20 (Michie 1998) (emphasis added).

The most significant element about the Virginia statute is that expertise in a medical malpractice case does not have to come from an individual practicing in the same specialty which is the subject matter of the cause of action. Rather, the expert witness must "demonstrate expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards." In that context, defendant's objections are without merit. It is significant to the Court that the defense chooses to make much of the fact that Dillard has not performed a cervical examine in many years, that he does not take calls on a regular basis to respond to pregnant patients, that he does not carry a beeper to respond to an answering service call from obstetrical patients, that he is not in a group practice, and a number of other matters which are related to the peculiar demands of an obstetrical practice. What Dillard does do, however, is on a regular and sustaining basis, deal in high-risk pregnancies with the goal of extending those pregnancies as long as possible so the fetuses have the greatest opportunity to develop before birth.

Dillard's testimony covers more than 300 pages of trial transcript. Prior to trial, he gave an extensive deposition, 123 pages in length. Defendant has had every opportunity to examine Dillard's credentials, to attack his credibility, to undermine his ability to express an opinion in the areas in which he has testified, and to determine the scope and extent to which he practices and the specific nature of his practice. They could have called his medical school dean or his contemporaries to verify his representations. They could have sought other forms of verification of his clinical work. Defendants have never evoked a scintilla of evidence to suggest that Dillard does not know the standard of care in dealing with a pregnant woman in a high-risk pregnancy when the issue is how to prevent preterm labor and extend that pregnancy in order to assure the more complete development of the fetus. That is what this case is about: defendants' failure to recognize and treat the preterm labor that was experienced by plaintiff, and collaterally, the failure to prepare for a preterm delivery by having sufficient neonatal support in order to assure the infants the best chance of survival.

In the course of establishing his credentials, Dillard testified that he is board certified in neonatal and perinatal medicine, that he is a clinical practitioner, that he is a medical director in a clinic managing the health care of low income pregnant women who would otherwise be without such care, and in the course thereof, regularly deals with preterm delivery. (Tr. Sept. 16, 1998, at 3–6.) He established that he practices and teaches at the Forsythe Medical Center, part of the Wake Forest School of Medicine, where there are a high number of deliveries every year. (Tr. Sept. 16, 1998, at 7–9.) Dillard teaches obstetrical residents patient management in high-risk pregnancies; he teaches medical students how to do the things that defendants in this case should have done in managing plaintiff to extend her pregnancy. (Tr. Sept. 16; 1998, at 7–8.) In the course of doing those things, Dillard testified that he is aware of the obstetrical standards because of his working parallel relationship with obstetricians on behalf of the children that the obstetricians' patients are carrying. (Tr. Sept. 16, 1998, at 4–6.)

Dillard further established his knowledge of the Virginia standard of care by virtue of the fact that he has frequent referrals of Virginia patients from Virginia doctors, that he reads articles from Virginia medical schools, that he has students teaching in Virginia with whom he consulted to make sure that his understanding of the standard of care in Virginia was correct, and that he has attended national conferences where the standard of care in

such matters is discussed. (Tr. Sept. 16, 1998, at 6–7; 9–14; 18–20.) He also publishes in peer review journals, including the Journal of Obstetrics and Gynecology, the Journal of Neonatology, and the American Journal of Obstetrics and Gynecology. (Tr. Sept. 16, 1998, at 21–23.) Following his *voir dire,* the Court ruled that he was competent to testify. (Tr. Sept. 16, 1998, at 73–77.)

In the course of his testimony, Dillard described a number of things which can be done to extend a pregnancy and which were not done in this case, describing the failures as violations of the standard of care. Most significantly, it was Dillard's testimony that Jenkins, on March 12, 1995, and more particularly Pearce, on March 14, 1995, violated the standard of care when they did not have plaintiff come in either to the office or to a hospital for an immediate cervical examination to determine whether she was beginning preterm labor. (Tr. Sept. 16, 1998, 215–16; 219–21.)

It is particularly important to the Court in determining that Dillard was competent to testify to the standard of care in this case that his testimony was corroborated by two imminently qualified defense experts, Dr. Frank Boehm, a professor of obstetrics and gynecology at the Vanderbilt Medical School, and Dr. Ware Branch, a Virginia trained obstetrician and gynecologist specializing in high-risk pregnancies and a professor at the University of Utah Medical School. In each instance, these defense experts testified that assuming the correctness of the symptoms described by plaintiff on March 12, 1995, to Jenkins, the standard of care was breached by the failure to have plaintiff come in for an immediate examination to determine whether there was an onset of preterm labor. (Tr. Sept. 28, 1998, at 7–9; 8–11.) These defense experts also testified that assuming the correctness of the symptoms described by plaintiff to Pearce on March 14, 1995, the standard of care would have required a cervical exam to be done to determine whether preterm labor had begun. (Tr. Sept. 28, 1998, at 10; 11–12.) While Boehm and Branch's testimony may have been markedly different from Dillard's testimony in other areas, on the issue of whether plaintiff should have had a cervical examine on March 12, 1995, two and one-half days before her precipitous near delivery in the back seat of a car, and March 14, 1995, one day before the twins were delivered, their testimony was the same. The evidence was sufficient for a jury to find that there was a violation of the standard of care.

The Court cannot praise highly enough the quality and nature of the expert testimony which was presented in this case by both sides. A number of relevant issues were explored, opposing opinions were rendered, and through it all the jury paid attention and listened. The testimony of the witnesses was rendered understandable by competent questioning, and the opinions were clear and concise. When it was all said and done, the jury had to resolve the question, based on the expert testimony, of whether there was a violation of the standard of care by the failure to examine plaintiff either on March 12, 1995, or on March 14, 1995; whether there was chorioamnioitis present in the placenta; and whether there was anything that could have been done to have extended plaintiff's pregnancy. On balance, the testimony rendered in this case supports the judgment of the jury that the standard of care was violated.

## G. The Court Declines to Reduce the Verdict Below the Statutory Cap.

Of all the post-trial motions, this has proven the hardest for the Court to decide. Even with a reduction, the award remains at One Million Dollars ($1,000,000.00). Is that a fair award given plaintiff's experience, the facts and circumstances surrounding the events which are the subject matter of this case, the pain and suffering she experienced, and the emotional loss of her children?

■ In determining the appropriateness of a verdict, a district court, hearing a case on the basis of diversity jurisdiction, must apply state law standards to determine whether the verdict is excessive. *See Steinke v. Beach Bungee, Inc.,* 105 F.3d 192, 197 (4th Cir.1997) (quoting *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 436–37, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996)). In that context, the Court is governed by two recent medical malpractice decisions in the Commonwealth of Virginia. *See Bulala v. Boyd,* 239 Va. 218, 389 S.E.2d 670 (1990); *Modaber v. Kelley,* 232 Va. 60, 348 S.E.2d 233 (1986). In *Bulala,* a jury awarded damages in excess of Eight Million Dollars ($8,000,000.00) as a result of the birth of a child suffering grave and permanent birth defects, including cerebral palsy, an inability to walk, and severely impaired mental development. *See Bulala,* 389 S.E.2d at 672–73. The mother alone was awarded One Million Eight Hundred Fifty Thousand Dollars ($1,850,000.00) in compensatory damages and One Million Dollars ($1,000,000.00) in punitive damages, and her husband was awarded One Million One Hundred Seventy–Five Thousand Dollars ($1,175,000.00) in compensatory damages. *See id.* 389 S.E.2d at 673. There was a motion to reduce the verdicts to the maximum amount recoverable under the medical malpractice cap in effect at that time, Seven Hundred Fifty Thousand Dollars ($750,000.00). *See id.*

The elements of plaintiff's claim for compensatory damage included perineal tearing due to the defendant's failure to perform an episiotomy, physical pain, mental suffering, medical expenses connected with her own physical injury, and the mental suffering she experienced resulting from the birth of an impaired child. *See id.* at 675. The reduced award, Seven Hundred Fifty Thousand Dollars ($750,000.00) was allowed to stand. *See id.* at 676. The child subsequently died slightly over three years after her birth and after the verdicts were returned in the trial court but before judgment was entered. *See id.* at 223, 389 S.E.2d 670.

In *Modaber,* action was instituted against a physician arising out of the stillbirth of a child. *See Modaber,* 348 S.E.2d at 233. The evidence supported a finding that the obstetrician's conduct during pregnancy caused injury to the plaintiff as a result of toxemia. *See id.* 348 S.E.2d at 234. As the court noted, "[e]ven though the evidence showed that Modaber's conduct did not cause the condition, which is a complication of pregnancy, nevertheless, defendant's inaction aggravated the effects of the condition upon her." *Id.* at 236. At the conclusion of trial, the jury found in favor of the plaintiff and awarded her Seven Hundred Fifty Thousand Dollars ($750,000.00) in compensatory damages. *See id.* at 234. The court also concluded that injury to the unborn child constituted injury to the plaintiff, allowing her to recover for physical injury and mental suffering associated with the stillbirth. *See id.* at 235. The record reflects a patient who was seriously neglected by her physician and on the verge of death when she was admitted to the hospital. *See id.* at 236.

In *Modaber,* because her toxemia had gone untreated, it had profound effects on the child she was carrying, ultimately resulting in the child's death immediately prior to its birth. *See id.* at 234–35. The plaintiff testified that she thought about her child every day and obviously manifested signs of grief at the profoundness of her loss. *See id.* at 238. In that case, as in the case now before the Court, the defendant argued that there was no evidence of any direct physical injury, except the still birth, experienced by the plaintiff; that her emotional distress was not so serious as to require counseling; and that there was not even evidence of a medical bill upon which her claim for damages could be based. *See id.* All of the foregoing, in fact, begs the issue. The essence of the *Modaber* decision appears in the last paragraph where the court stated:

The jury could also have concluded from the proof that the plaintiff suffered mental anguish in many ways. For example, she was permitted to lie conscious in a hospital for nearly two hours knowing that the heartbeat of her unborn child was diminishing steadily. She is bound to have been aware that her unborn child was in danger of dying and, yet, her physician, who lived minutes from the hospital, failed to appear to care for her and the fetus. She must have realized that her own condition was grave. She was forced to deliver, spontaneously and unattended, a dead child. At the trial, held almost four years after the stillbirth, the plaintiff testified that the traumatic experience was still a recurring and daily memory. Under these circumstances, we cannot say that the amount of the verdict shocks our conscience or creates the impression that the jury acted from improper or illegal motives.

*Id.* at 239.

■ The quote could have been lifted, with certain exceptions, from the transcript of this trial. Plaintiff, a slight woman, testified about her educational background as a teacher in her pursuit of her career, in parallel with her husband who is pursuing a graduate degree, and their joint decision to defer having children. She shared with the jury their decision, as her husband was completing his graduate degree, that it was time to begin planning a family, and they consciously set out to do so resulting in a pregnancy which was, albeit, short lived. Almost immediately thereafter, and without the intervention of a menstrual period, plaintiff became pregnant again, and it was to her delight and her husband's that she learned in January, 1995, that she was carrying twins. Her testimony, her demeanor, and her attitude on the stand indicated to a jury, unequivocally, that she sought quality medical care for her own benefit and for the benefit of her unborn children and that she expected to follow the advice of her physicians. The record also reflects that when she perceived problems developing, she was not reluctant about calling her physicians and seeking advice, as evidenced by her unscheduled visit on March 7, 1995, her call on an emergency basis on March 12, 1995, and her call two days later on March 14, 1995, in the evening.

The jury could not have been unmoved by her discussion of the pain she experienced, corroborated by friends and her husband. The pain which began before her March 7, 1995 visit and continued on an increasing level through the delivery on March 15, 1995, ultimately became almost unbearable. On March 12, 1995, plaintiff had so much pain she was forced to leave a social engagement and go home. On March 14, she had to lay down on the floor to try and find relief from the pain and could only walk by hanging on to a chair. On the morning of March 15, plaintiff's husband found her on the floor, unable to complete her shower. Hastily getting clothes on her, he carried her to the hospital where she was in so much pain she could not even respond when hospital personnel tried for a second time to take her vital signs. She refused to have her clothes put back on her and left, not so much dressed as merely covered, in the back of a car en route to the Office.

While en route, plaintiff had the experience of knowing that her water had broken and that delivery had begun. That the delivery was precipitous and quick is evidenced by the fact that she arrived at the doctor's office at 10:28 a.m. on March 15, 1995, and the first child was delivered at 10:48 a.m. Thereafter, plaintiff had the experience of actually holding children, born so prematurely that their eyes were fused and their skin was translucent. She then suffered the almost unimaginable horror of knowing that nothing would be done to assure the survival of her twins and, inevitably and not unexpectedly, shortly after their birth, each expired. In the course of her testimony at trial, plaintiff testified that every day of her life she thinks of

those twins; that when she encounters twins in social settings and in public, she has an extremely difficult time dealing with them, thinking that but for the conduct, or lack of conduct, by her health care providers, she might also have been enjoying two boys. Plaintiff's testimony was touching, heartfelt, never maudlin, and certainly not impeached. At the end of the trial, having concluded that the standard of care was breached in plaintiff's treatment and care, the jury could certainly recall sufficient facts to establish the profoundness of her loss.

In *Modaber*, the Virginia Supreme Court found a verdict in the sum of Seven Hundred Fifty Thousand Dollars ($750,-000.00) for the death of a stillborn child not excessive. The Virginia Supreme Court in *Bulala*, found the birth of a severely retarded child, and perineal tearing because of the failure to perform an episiotomy, sufficient to support an award in excess of the statutory cap and reduced it to Seven Hundred Fifty Thousand Dollars ($750,000.00), the statutory maximum.

This Court cannot say that an award of One Million Dollars ($1,000,000.00) based on the preterm birth and subsequent loss of two infants because of a failure to adequately treat preterm labor is excessive or "shocks the conscience of the Court and creates the impression that the jury was biased in favor of the plaintiff or prejudiced against the defendant or has misconceived or misunderstood the facts or the law." *Modaber*, 348 S.E.2d at 238.

### III. CONCLUSION

For all of the foregoing reasons, the motion for a judgment not withstanding the verdict is DENIED; the motion for a new trial is DENIED; the motion for a remitter, save and except to bring the award in conformity with the statutory cap, is DENIED, and the motion for permission to contact members of the jury is DENIED.

The Clerk is DIRECTED to enter judgment in favor of plaintiff and against David C. Pearce in the sum of One Million Dollars ($1,000,000.00). The Clerk is further DIRECTED to mail a copy of this Order to all counsel of record.